**Christian R. VALENCIA, an Infant by his Mother and Natural Guardian, Teresa FRANCO, Plaintiffs,**

v.

**Sung M. LEE and Shiu Chun Lee, and The City of New York, Defendants.**

No. Civ.A. 97–CV–3205 (DGT).

United States District Court, E.D. New York.

June 23, 1999.

Alberto Casadevall, Fitzgerald & Fitzgerald, P.C., Yonkers, New York, NY, for plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York by Thomas G. Merrill, New York City, for City of New York.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Infant plaintiff Christian Valencia, by his mother and natural guardian, commenced an action against defendants Sung M. Lee and Shiu Chun Lee, owners of the apartment in which he lived, and defendant City of New York seeking compensatory damages for developmental injuries he allegedly sustained from exposure to unsafe levels of lead in the apartment.

### Background

#### (1)

Christian Valencia was born on March 11, 1992. *See* Plaintiffs' Statement Pursuant to Local Rule 56.1 ("Pl. R.56.1"), ¶ 1. From the time of his birth until November 1, 1995, he lived with his family in an apartment in a building located at 441 46th Street in Brooklyn, New York. *Id.* at ¶ 2. During plaintiffs' entire tenancy in the building, it was owned by defendants Sung M. Lee and Shiu Chun Lee. *Id.* at ¶ 3.

In the course of infant plaintiff's pediatric care, his blood was screened for lead and he was found to have the following blood lead levels:

| Date | Lead Level [1] |
|------|------------|
| 3/3/93 | 14 |
| 7/19/93 | 30 |
| 8/23/93 | 19 |
| 11/8/93 | 15 |
| 2/10/94 | 13 |
| 5/17/94 | 12 |
| 10/31/94 | 11 |
| 4/26/95 | 12 |
| 6/26/95 | 17 |
| 8/1/95 | 15 |
| 11/7/95 | 12 |
| 6/10/96 | 6 |

*Id.* at ¶ 4; Merrill Decl., Exh. F (Sunset Park Family Health Center Records). A blood lead level of ten ug/Dl or higher is considered to be poisoning under the City's own Health Code. *See* R.C.N.Y. § 11.03. *See also* Rosen Aff., ¶ 21 (irreversible impairments, such as brain damage, reduced IQ, delayed cognitive development and learning disabilities, occur at blood lead levels above and below 10 ug/Dl). At some point after July 19, 1993, the City's Department of Health was notified that Christian Valencia had a blood lead level of 30 ug/Dl. *See* Pl. R.56.1, ¶ 5. Pursuant to the New York City Health Code, the Department of Health ("DOH") inspects the home of any person it is notified has a blood lead level equal to or greater than 20 ug/Dl. *See* 13 R.C.N.Y. § 173.13. Subsequently, DOH inspected plaintiffs' apartment (for the first time) on August 25, 1993. Pl. R.56.1, ¶ 5 (citing DOH Records). It tested 78 surfaces in the apartment and sent an Order to Abate Nuisance, dated September 16, 1993, to the Lees directing them to repair 56 surfaces which it found to have peeling lead-based paint. *See* Rosen Aff., Exh. 2 (Order to Abate Nuisance). The Order to Abate Nuisance warned the Lees that the 56 incidences of peeling and flaking lead paint "constitute[d] a nuisance in that they present[ed] a danger to the life or health of the child/children of the above-referenced premises." *Id.* Although the Lees began the repair work in 1993, repairs on the apartment were not completed until 1996. *See* Merrill Decl., Exh. I (Franco Dep., pp. 35–36).

During the period of time after the Valencia's apartment was found to contain dangerous and life-threatening levels of lead and before the repairs were completed, the Valencias continued to reside in the apartment. On August 26, 1993, May 2, 1994 and August 30, 1995, the Valencias were visited by DOH Public Health Advisors ("PHA"). During these visits, the PHA advised infant plaintiff's mother

---

**1.** Blood lead levels are recorded in units of    micrograms per deciliter ("ug/Dl").

"about the environmental hazards of Pb (lead) poisoning," admonished her "to keep Chris away from [ ] red-stamped areas" indicative of lead paint contamination, instructed her on "good housekeeping techniques such as hand washing at all times for Chris, damp mopping and keeping home free of dust," and "reviewed nutritional information" with her. Rosen Aff., Exh. 2 (PHA Notes for Visits, dated 8/26/93, 5/2/94, 8/30/95). During this period, Plaintiffs were also visited by inspectors from the DOH on August 25, 1993, September 27, 1993, October 19, 1993, November 10, 1993, February 16, 1995, March 8, 1995, and July 15, 1995, who documented in their reports a continuing hazard to infant plaintiff's health from unrepaired lead paint violations. *See id.* (Reports of Inspection).

Shortly before plaintiffs moved out of the 46th Street apartment on November 1, 1995, a number of lead hazards remained, and there is no indication that these remaining hazards were repaired before plaintiffs relocated. *See id.* (Report of Inspection, dated 9/28/95). In fact, it appears that despite the DOH's significant intervention in the matter, its September 16, 1993 Order to Abate was not fully complied with until June 1996. *See id.* (Report of Inspection, dated June 28, 1996).

DOH inspectors and public health advisors did not expressly represent to plaintiffs that the apartment was safe to remain in while repairs were ongoing, and even appear to have informed infant plaintiff's mother that the owner of the apartment would have to relocate her and her family while the apartment was being repaired. *See* Def. R.56.1, Exh. I (Franco Dep., pp. 32–33). Moreover, there is clear evidence that PHA and DOH inspectors warned infant plaintiff's mother, on several occasions, that the lead poisoning hazard which existed in the apartment at the time of the City's initial inspection on August 25, 1993 remained throughout the balance of plaintiffs' tenancy. *See* Rosen Aff., Exh. 2 (PHA Notes for Visits, dated 8/26/93, 5/2/94, 8/30/95). There is no evidence, however, that the City ever took affirmative steps to warn plaintiffs' family that, even if the preventative and remedial steps recommended by the PHA were taken, dangers to infant plaintiff's health from living in the lead-poisoned apartment remained.

(2)

Plaintiffs commenced this action on May 8, 1997 by filing a summons and complaint with the clerk of the Supreme Court of the State of New York, Kings County, alleging: (1) violation of the Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. § 4821 *et seq.;* (2) violation of the New York City Health Code; (3) violation of 42 U.S.C. § 1983; (4) negligence; (5) breach of contract and implied warranty of habitability; (6) nuisance and absolute nuisance; (7) tortious misrepresentation; and (8) negligent or intentional infliction of mental distress. The City removed this action to federal court on June 2, 1997. *See* Merrill Decl., Exh. A (Notice of Removal). Defendants Sung M. Lee and Shiu Chun Lee failed to answer the complaint, and plaintiffs obtained a default judgment against them.

Defendant City of New York ("defendant") has moved for summary judgment, and plaintiffs have opposed that motion as to all but three of plaintiffs' claims. Plaintiffs have conceded that there is insufficient evidence to support the federal law claims (first and third causes of action), *see* Merrill Decl., Exh. D (Pl. Let., dated 10/15/98), and have also acknowledged that their fifth cause of action, which alleges a breach of a warranty of habitability, is not directed at defendant City of New York. *See* Merrill Decl., Exh. C (Pl.Resp. to Def. Ints., No. 5). Accordingly, defendant's motion for summary judgment is granted as to plaintiffs' first, third and fifth causes of action.

### Discussion

Defendant contends, as a threshold matter, that plaintiffs' remaining state law claims are barred by New York's applicable statute of limitations. Section 50–i of the New York General Municipal Law requires, as a condition precedent to filing a negligence or personal injury action against a city, the filing of a notice of claim on the city within 90 days after the claim arises. *See* N.Y.Gen.Mun.Law §§ 50–i, 50–e (Mckinney's 1999). Once a party files a notice of claim, the party has "one year and ninety days [from] the happening of the event upon which the claim is based" to commence an action, or the claim will be time barred. *Id.* at § 50–i(c). This statutory limitations provision is subject to C.P.L.R. 208 which provides: "If a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action ... is less than three years, the time shall be extended by the period of disability." N.Y.C.P.L.R. 208 (Mckinney's 1999).

Here, the infant plaintiff's mother, represented by counsel, timely filed a notice of claim, but failed to commence an action within the one year and ninety days provided by the applicable statute of limitations. Defendant argues that because infant plaintiff's legal guardian retained an attorney who filed a notice of claim upon the City, plaintiff was no longer under a "disability because of infancy" within the meaning of C.P.L.R. 208 and that, therefore, the tolling provisions of C.P.L.R. 208 do not apply. The Second Department's decision in *Henry v. City of New York*, 244 A.D.2d 93, 676 N.Y.S.2d 616 (2d Dept. 1998) squarely supports defendant's argument. *Id.* at 95, 676 N.Y.S.2d at 617 (infant plaintiff not under disability due to infancy where infant, through efforts of legal guardian, was represented by counsel who timely filed a notice of claim). The First Department, however, in *Rosado v. Langsam Property Serv. Corp.*, 251 A.D.2d 258, 675 N.Y.S.2d 53 (1st Dept.1998), came to the opposite conclusion. *Id.* (filing of notice of claim by legal representatives does not preclude infant plaintiff from invoking tolling provisions of C.P.L.R. 208). Thus, as both parties acknowledge in their memoranda, there is an obvious split in authority on the statutory tolling issue. After defendant served its motion papers, the New York Court of Appeals granted leave to appeal in *Henry v. City of New York*, 244 A.D.2d 93, 676 N.Y.S.2d 616 (2d Dept.1998), *leave to appeal granted*, 93 N.Y.2d 802, 687 N.Y.S.2d 626, 710 N.E.2d 273 (Feb. 18, 1999) (Table No. 1473). Pending the issuance of the Court of Appeals' decision in that case, this court denies the motion to dismiss on statute of limitations grounds, with leave to renew if the forthcoming decision of the Court of Appeals is helpful to the defendant. Defendant's remaining contentions will be addressed on the merits; at least one of plaintiffs' claims will survive defendant's motion for summary judgment.

### (1)

### Causation

Defendant argues that plaintiffs have not established causation in two aspects: one, that agents of the City, through their actions or inactions while under a duty to act, caused infant plaintiff's blood lead levels to be higher than they would have been had the City acted differently; and two, that infant plaintiff suffered additional injury as a result of increased blood lead levels attributable to the City's conduct. Plaintiffs contend that causation has been established through the submission of an expert report and supporting affidavit.

■ It is well-settled that a plaintiff bears the burden of proof on issues of causation. *See Andrade v. Wong*, 251 A.D.2d 609, 610, 675 N.Y.S.2d 112, 113 (2d Dept.1998) (granting summary judgment where plaintiff offered no proof that infant continued to eat paint chips after defendants were put on notice that premises contained lead-based paint, or that addi-

tional injury had been sustained as a result thereof); *Jones v. Cox,* 254 A.D.2d 333, 679 N.Y.S.2d 67, 68 (2d Dept.1998) (same); *Brown v. Marathon Realty, Inc.,* 170 A.D.2d 426, 428, 565 N.Y.S.2d 219, 221 (2d Dept.1991) (same). In his report, plaintiffs' expert, Dr. John Rosen, M.D., concludes, to a reasonable degree of medical certainty, that: "[infant plaintiff's] lead poisoning was caused by ingestion of lead based paint at his home"; and plaintiff suffers from a number of "neurobehavioral and cognitive deficits"[2] which "were caused by early and long-lasting childhood lead poisoning." Rosen Aff., Exh. 1 (Report of Dr. Rosen, dated 6/23/98). The report notes infant plaintiff's history of lead poisoning over a period of "2–2/3 years, *at the very least." Id.* (emphasis in original). In his affidavit, Dr. Rosen opines, to a reasonable degree of medical certainty, that: "during the period beginning after the DOH inspected the apartment on August 25, 1993 and the time when the infant plaintiff moved out of the apartment on or about November 1, 1995 he continued to be lead poisoned as evidenced by the blood lead values ... which remained above the poisoning threshold of 10 ug/Dl"; and "the infant plaintiff's early and long lasting childhood lead poisoning caused the deficits the infant evidenced on neurobehavioral testing." Rosen Aff., ¶¶ 25, 33. He also notes that DOH records establish that "the lead paint hazard in the subject apartment was not completely or properly abated from the time the DOH inspected on August 25, 1993 to the time the infant plaintiff moved out from said apartment, on November 1, 1995, a period of more than two years." *Id.* at ¶ 29. Dr. Rosen further attests that

while infant plaintiff's mother was properly advised on safety procedures by DOH Public Health Advisors,[3] and while "the medical care received as well as the safety procedures followed were factors in the infant's gradually declining lead levels," *id.* at ¶¶ 35–37, *"the failure to abate the lead paint in the apartment resulted in continued lead exposure to the infant plaintiff which was a factor in allowing his lead levels to remain elevated." Id.* at ¶ 38 (emphasis added). Dr. Rosen's report and affidavit, taken together, appear to establish: that the DOH's failure to take immediate action to abate the lead hazard in plaintiffs' apartment was a cause of infant plaintiff's elevated blood lead levels; that, had the City acted promptly in abating the nuisance, infant plaintiff's blood lead levels would have been measurably lower; and that infant plaintiff suffered additional injury as a result of such increased blood lead levels. Indeed, within months after moving out of the apartment in 1996, infant plaintiff's blood lead level dropped below 10 ug/Dl to 6 ug/Dl for the first time since his pediatrician began testing him in March 1993.

Defendant argues that Dr. Rosen's report fails to establish either element of causation. First, defendant contends that, in his report, Dr. Rosen did not address "what injuries were caused by the earlier blood lead level of 30 ug/Dl and what injuries were caused by the subsequent lower levels." Def.Mem. of Law, p. 14. Second, defendant, quoting Dr. Rosen's deposition testimony taken from other cases,[4] contends that it is "entirely speculative to assume that Christian Valencia's subse-

---

**2.** According to Dr. Rosen, infant plaintiff suffers from "deficits in IQ ... visual-perception integration, visual-constructional and memory integration, 2–dimensional apraxia, attending to-carrying out-and concentrating on mental calculations (indicating evidence of a learning disabled child), coupled to an attention deficit-hyperactivity disorder." Rosen Aff., Exh. 1 (Report of Dr. Rosen, dated 6/23/98).

**3.** Safety procedures on which infant plaintiff's mother was advised include "environmental and medical aspects; nutritional guidelines; literature; housekeeping and wet mopping of floors; keeping the infant away from areas stamped 'lead paint'; and taping over defective surfaces." Rosen Aff., ¶ 36.

**4.** Dr. Rosen has not yet been deposed in this case.

quent blood lead levels would have been any lower if DOH had acted differently." *Id.* at 15.

While there is some merit to defendant's causation argument as it pertains to Dr. Rosen's report—the report speaks only generally to infant plaintiff's lead poisoning without specifically implicating the City in any misconduct—defendant's contentions are not borne out by a review of all of the relevant documents. Dr. Rosen's affidavit appears to establish a direct connection between the conduct of City employees, infant plaintiff's elevated blood lead levels, and *additional* injuries suffered by infant plaintiff. *See* Rosen Aff., ¶¶ 24, 25, 33, 38.

Nor will defendant's reliance on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) avail it. *Daubert,* which requires that an expert's testimony be both reliable and relevant to be admissible, firmly establishes the trial judge in the role of "gatekeeper." *Id.* at 589, 113 S.Ct. 2786. The significance of that role has recently been reaffirmed by the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 1170, 143 L.Ed.2d 238 (1999). In that case, the Supreme Court underscored the discretionary nature of the trial judge's "gatekeeping" duty, and the "broad latitude" granted to district judges in evaluating an expert witness' reliability. *See id.*

Here, Dr. Rosen's curriculum vitae establishes him to be a preeminent member of his profession. He has engaged in numerous studies and published in respected medical journals articles too numerous to list here. Dr. Rosen is presently a Professor of Pediatrics and Head of the Division of Environmental Studies at Albert Einstein College of Medicine and an Attending Pediatrician at Montefiore Medical Center, Bronx, New York. Notably, Dr. Rosen twice served as Chairperson of the Childhood Lead Poisoning Prevention Advisory Committee of the Centers for Disease Control and Prevention ("CDC"). He also

was appointed to a committee formed by the National Academy of Sciences that has published an extensive report on lead exposure in sensitive populations. In addition, Dr. Rosen served as a Peer Reviewer for the Agency for Toxic Substances and Disease Registry of the Public Health Service which produced a report which was submitted to Congress. Finally, also on the federal level, Dr. Rosen served on the United States Environmental Protection Agency Peer Review Panel and is a member of the Committee for the National Academy of Sciences, both of which produced reports on lead poisoning during his tenure. In forming the opinions which he states in his report and supporting affidavit, Dr. Rosen relied upon: his personal examination of infant plaintiff on May 26, 1998; medical examination records of infant plaintiff from Dr. D.E. Freyre, the Sunset Park Family Health Center and the Lutheran Medical Center; and DOH records, as well as his expertise in the field of lead toxicology. *See* Rosen Aff., Exh. 1 (Report of Dr. Rosen). Thus, there appears to be little question that Dr. Rosen is qualified to give expert testimony on the subject of childhood lead poisoning, and that the bases upon which he rests the opinions set forth in his report and affidavit exhibit sufficient indicia of reliability. Moreover, Dr. Rosen's affidavit, which establishes a causal connection between defendant's failure to take proper steps to protect infant plaintiff from the dangerous lead condition in plaintiffs' apartment after voluntarily assuming the duty to do so, and infant plaintiff's elevated blood lead levels and subsequent injury, easily satisfies *Daubert's* relevancy requirement.

Thus, at the very least, a genuine issue of material fact exists on the question of causation. Accordingly, defendant's motion for summary judgment on the basis of lack of proof of causation is denied as a reasonable jury could conclude that plaintiffs have established causation.

(2)

## Private Right of Action in Tort Under New York City Health Code

Plaintiffs allege that "[t]he City is liable for injuries resulting from exposure to the lead-paint [sic] in the apartment due to its failure to enforce [New York City Health Code ("NYCHC") § 173.13]." Pl.Mem. of Law, p. 24. Defendant contends that plaintiffs do not have a private cause of action in tort under the NYCHC because the City did not owe plaintiffs a duty to use reasonable care in enforcing municipal regulations.

Under New York City Health Code § 173.13(d)(2), the DOH is required to "order the removal of [lead-based] paint" when it is put on notice that lead paint of a certain content is present in an apartment and "the blood-lead level of any person residing in such dwelling is 20 micrograms per deciliter or higher." 24 N.Y.Comp. Codes R. & Regs § 173.13[d][2]. If the owner of the apartment fails to comply with the order within five days after service thereof, the DOH "shall request the Department of Housing Preservation and Development to execute such order." *Id.*

■■■ As the New York Court of Appeals has noted numerous times, it has long been the rule in this State that, " 'absent a special relationship creating a municipal duty to exercise care for the benefit of a particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation.' " *Kenavan v. City of New York*, 70 N.Y.2d 558, 568, 523 N.Y.S.2d 60, 64, 517 N.E.2d 872 (1987) (quoting *O'Connor v. City of New York*, 58 N.Y.2d 184, 192, 460 N.Y.S.2d 485, 488, 447 N.E.2d 33 (1983) (additional citations and quotations omitted)). A "special relationship" exists when a municipality has either: (1) "violated a duty commanded by a statute enacted for the special benefit of particular persons"; (2) "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby"; or

(3) "assume[d] positive direction and control under circumstances in which a known, blatant and dangerous safety violation exists." *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 261–62, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717 (1983).

■■■ In this case, the first of the three "special relationships" appears not to have been established. Section 173.13(d)(2) does not apply to the "special benefit" of a "particular class" of persons, such as children, *Garrett*, 58 N.Y.2d at 261, 460 N.Y.S.2d 774, 447 N.E.2d 717, but rather to "any person" with a certain blood lead level residing in a dwelling containing paint with a certain lead content. 24 N.Y.Comp.Codes R. & Regs § 173.13[d][2]. See *Davis v. Owens*, 259 A.D.2d 272, 686 N.Y.S.2d 31 (1st Dept. 1999) (holding that § 173.13 benefits general public, not specific plaintiffs, and, therefore, does not give rise to requisite special duty); *Lindsay v. New York City Housing Auth.*, No. 95–CV–3315, 1999 WL 104599, at *8 (E.D.N.Y. Feb. 24, 1999) (interpreting New York law and concluding that "[§ 173.13] was created for the benefit of all residents of New York City who live in a dwelling and not for the special benefit of children."); *Franklin v. Caisi Mgmt.*, 95–CV–3460, slip-op. at 16 (E.D.N.Y. June 5, 1997) (same). This conclusion is bolstered by the Introductory Notes to Article 173 of the NYCHC which "emphasize that the goal of regulation is to protect all residents in New York City against the hazards caused by lead-based paint." *Lindsay*, 1999 WL 104599, at *8 (citing N.Y.Comp.Codes R. & Regs vol. 9, § 173 (Introductory Notes) (emphasis added)). Moreover, there are a number of provisions in the NYCHC which focus specifically on the dangers posed by lead poisoning to children, suggesting that when the drafters of the code wanted to single out children for special protection, they knew how to do so. See, e.g., 24 N.Y.Comp.Codes R. & Regs § 173.13[b] (prohibiting lead paint or coating in "toys, children's furniture or any·other articles of

things intended for use by children"); 24 N.Y.Comp.Codes R. & Regs § 173.13[c] (prohibiting use of lead paint on residential surfaces "readily accessible to children under seven (7) years of age."). Thus, it appears beyond question that § 173.13 was enacted for the benefit of the general public and, as such, does not create a "special relationship" between infant plaintiff and the City. Accordingly, for plaintiffs' claim to survive, plaintiffs must establish the existence of a "special relationship" based upon either of the remaining exceptions to the general rule immunizing municipal bodies from liability for negligently performing governmental functions. Here, it appears that plaintiffs will, in fact, be able to establish the existence of a "special relationship" based upon both the second and third of the exceptions set forth in *Garrett*. See *Garrett*, 58 N.Y.2d 253, 261–62, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717.

■■■ Turning to the second exception, "[e]stablishment of a special relationship requires demonstration of (1) the municipality's assumption, through promise or actions, of an affirmative duty to act on behalf of the victim, (2) knowledge on the part of the municipality's agents that inaction could lead to harm, (3) some form of direct contact between the municipality's agents and the victim, and (4) justifiable reliance by the victim upon the municipality's affirmative undertaking ..." *Bargy v. Sienkiewicz*, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (3d Dept.1994) (citations omitted). Here, plaintiffs have submitted sufficient evidence to raise triable issues of fact regarding the existence of a special relationship.[5] Defendant appears to have voluntarily assumed a duty—to protect infant plaintiff from harm resulting from lead poisoning—through its promises and actions, the proper execution of which plaintiffs appear to have justifiably relied

upon as a result of direct contact with defendant's agents.

In this case, defendant went beyond its statutory duty to order plaintiffs' landlord and the Department of Housing Preservation and Development to abate the lead paint nuisance in plaintiffs' apartment. DOH inspectors visited plaintiffs' apartment no fewer than seven times between August 25, 1993 and September 28, 1995, and documented a continuing threat from lead paint to infant plaintiff's health and life. During the same period, plaintiffs were visited by at least three DOH Public Health Advisors who advised infant plaintiff's mother about the environmental hazards of lead poisoning, the importance to infant plaintiff's health of wet mopping and frequent hand washing, and the significance of following a diet high in iron and calcium and low in fats, salts and sugar. DOH employees also told plaintiffs that the owner of the building would repair the apartment, and after the owner had failed to do so, that the City would repair it. *See* Pl. R.56.1, Exh. I (Franco Dep., p. 35). Plaintiff's mother testified at her deposition that, despite representing to her that the City would make the necessary repairs to her apartment, the City never made any such repairs, and such repairs were ultimately completed—more than two years later—by the owner. *Id.* at pp. 35–36.

There is, moreover, no indication that any of these Public Health Advisors warned plaintiffs that even if plaintiffs followed their advice, infant plaintiff could be harmed by lead in the apartment until such time that the lead hazard was completely abated. Nor is there any indication that any of the PHA, or any other employee of the DOH, despite making numerous visits to plaintiffs' apartment, ever advised or encouraged plaintiffs to relocate to a new apartment pending the completion of repairs. Although plaintiffs ex-

---

**5.** Plaintiffs' complaint does not plead the existence of a special relationship based on negligent performance of a voluntarily assumed duty. However, plaintiffs' memorandum of law and supporting documentation adequate-

ly put defendant on notice of this alternative legal theory. Accordingly, at trial, plaintiffs will be granted leave to amend their pleadings to conform to their proof.

pressed a desire to leave the apartment and even requested that the City help to relocate them to a different apartment, they were not relocated. A DOH employee did tell infant plaintiff's mother that "when the apartment was being fixed, the owner was going to have to relocate [plaintiffs' family]," Pl. R.56.1, Exh. I (Franco Dep., p. 33); however, there is no indication that the employee warned her that remaining in the apartment could be detrimental to infant plaintiff's health.

Plaintiffs appear to have relied upon the PHA advice in deciding to remain in the apartment in spite of the unspoken continuing danger to infant plaintiff's health. What shows reliance on the PHA is that plaintiffs took all of the steps that the PHA recommended and remained in the apartment, believing that if they took those steps, infant plaintiff would be safe.

■ Defendant contends that plaintiffs could not have relied on the advice of DOH employees because plaintiffs were, at the time of the PHA visits to plaintiff's apartment, represented by counsel who had filed a notice of claim with the City on plaintiffs' behalf. This argument assumes that plaintiffs' filing of a notice of claim, which is a statutory prerequisite to the maintenance of an action against the City, or plaintiffs' representation by counsel, somehow vitiates plaintiffs' reliance on the advice of the DOH's PHA. This argument fails for two reasons. First, a notice of claim merely preserves a plaintiff's right to sue in the future. It does not reflect a claimant's state of mind, or signify that a potential plaintiff has any reason to know that, although a past harm resulting from exposure to a lead hazard has been suffered, that a future hazard may result as well, even if instructions given by City health workers are followed. Second, there is no evidence that plaintiffs were warned by any legal advisor that dangers to infant plaintiff's health remained, even if they followed all of the PHA guidelines, so as to undermine their alleged reliance on the DOH's Public Health Advisors. If any

such warning had been made, presumably, plaintiffs would have moved out of their apartment to protect their infant son's health—indeed, as one of the PHA's noted, "[m]other appeared very concerned about her child's health." Rosen Aff., Exh. 2 (PHA Notes for Visits, dated 5/2/94).

Accordingly, a jury could certainly conclude that plaintiffs relied upon the advice of the DOH's PHA to conclude that as long as certain cautionary measures were taken, infant plaintiff would not be in danger of continuing lead poisoning. A jury could also conclude that plaintiffs would have moved had they been apprised by the DOH, or anyone else, of the danger that remaining in the apartment posed to infant plaintiff's health. Thus, it appears that the City voluntarily assumed an affirmative non-statutory duty to act on behalf of infant plaintiff on which plaintiffs reasonably relied.

Defendant also argues that *Davis, Franklin* and *Lindsay,* discussed above, require dismissal of plaintiffs' second exception special relationship claim. This contention, however, is not borne out by the cases cited. Those cases firmly address plaintiffs' first contention—that failure to enforce § 173.13 gives rise to a private cause of action—and uniformly hold that such failure does not give rise to an independent cause of action. *See* discussion, *supra.* However, none of those cases present the issue presented by this case, to wit, whether a "special relationship" between a municipality and an injured plaintiff can be created where the municipality exceeds its statutory obligation to order abatement of a lead paint nuisance by: repeatedly inspecting the plaintiffs' apartment, and advising the plaintiffs on lead poisoning prevention techniques without alerting the plaintiffs of the dangers to an infant plaintiff's health risked by remaining in the poisoned apartment that may persist in spite of the implementation of such techniques.

New York courts have found that where a municipality "exceed[s] its general duty

of inspection and abatement" under § 173.13, that municipality "may have voluntarily assumed a particular duty to use due care for the benefit of [ ] infants [living in the apartment]." *Bargy v. Sienkiewicz*, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (3d Dept.1994) (citing *Florence v. Goldberg*, 44 N.Y.2d 189, 195–97, 404 N.Y.S.2d 583, 586–87, 375 N.E.2d 763 (1978)). *See also Thomas v. City of New York*, 180 A.D.2d 588, 580 N.Y.S.2d 1008 (1st Dept.1992) (lead poisoning case holding that "[t]he conduct of various City agencies sufficed to establish each of the requisite elements of a special relationship, including the 'key element' of 'direct contact between agents of the municipality and the injured party.'") (quoting *Sorichetti v. City of New York*, 65 N.Y.2d 461, 469, 492 N.Y.S.2d 591, 596, 482 N.E.2d 70 (1985)); *New York City Coalition to End Lead Poisoning v. Koch*, 138 Misc.2d 188, 197, 524 N.Y.S.2d 314, 320 (Sup.Ct.N.Y. County 1987), *aff'd. in a summary order*, 139 A.D.2d 404, 526 N.Y.S.2d 918 (1st Dept.1988) (holding that plaintiffs in a class action lead poisoning case seeking both injunctive relief and damages "should be given the opportunity" to demonstrate a "special relationship" between the plaintiffs and the City at trial.).[6]

In *Bargy*, after plaintiff's infant sons were diagnosed with lead poisoning and an inspection of her apartment revealed that a lead hazard existed, the plaintiff was notified to vacate her apartment, which she did. After a county health services employee informed plaintiff that it was safe to return to her apartment, she did so. Several months later, one of plaintiff's sons again tested positive for lead poisoning, and inspection of the apartment indicated a mild lead hazard. Plaintiffs once more moved out of the apartment, only to return upon the assurance of the same county employee that the lead nuisance had been abated. Once again, infant plaintiff tested positive for lead, and inspection of the apartment revealed dangerously high levels of lead in paint chips on window sills in the kitchen and living room of the apartment. Plaintiffs then permanently vacated the apartment. The Third Department concluded that "contrary to its argument, [the county] may have voluntarily assumed a particular duty to use due care for the benefit of the infants ... to protect them from lead poisoning," which infant plaintiff relied upon to his detriment. *Bargy*, 207 A.D.2d at 609, 615 N.Y.S.2d at 522.

For largely the same reasons expressed by the Third Department in *Bargy*, plaintiff's claim "supports a reasonable inference that she relied upon the [City's] assumption of a duty to protect her children from potential lead poisoning through its inspections and representations regarding the detection and abatement of lead hazards in the apartment." *Bargy*, 207 A.D.2d at 609–10, 615 N.Y.S.2d at 523 (citations omitted). Accordingly, plaintiffs have submitted sufficient evidence of the existence of a "special relationship" to create triable issues of fact.

A strong argument can also be made that plaintiffs have submitted sufficient evidence to create a genuine issue of material fact on the third exception to the general rule of municipal immunity from liability for negligent exercise of a government function. Here, the City also appears to have "assume[d] positive direction and

---

6. In footnote 14 to defendant's memorandum of law, defendant wrongly implies that *Coalition to End Lead Poisoning* recognized a private cause of action for the enforcement of Administrative Code's lead abatement provision, § 27–2013(h) ("Local Law 1"), and nothing more. In fact, despite defendant's implied assertion to the contrary, *Coalition to End Lead Poisoning* specifically recognized a private cause of action in favor of plaintiffs in a lead poisoning case toward whom the City has voluntarily obligated itself by creating a "special relationship." *See Coalition to End Lead Poisoning*, 138 Misc.2d at 197, 524 N.Y.S.2d at 320. Local Law 1, a law which imposes lead abatement obligations on owners of multiple dwellings in which children six years of age or younger reside, *see* Admin.Code of City of N.Y. § 27–2013[h] [Local Laws, 1982, No. 1 of City of New York], is not relevant to this case.

control under circumstances in which a known, blatant and dangerous safety violation," to wit, the lead hazard in plaintiffs' apartment, existed. *Garrett*, 58 N.Y.2d at 262, 460 N.Y.S.2d at 778, 447 N.E.2d 717. The City was, at all times, aware of the "blatant and dangerous" safety hazard that the lead contamination in plaintiffs' apartment posed to infant plaintiff's health. *Id.* However, the City, after apparently taking control of the situation, failed to take proper steps to safeguard infant plaintiff's health. As discussed above, plaintiffs relied on the City's advice and direction, and infant plaintiff may thereby have been harmed. Accordingly, triable issues of fact exist on this basis as well.

Defendant next contends that even if plaintiffs are able sufficiently to establish a "special relationship" arising out of the performance of a municipal function, no private cause of action, either express or implied, exists because the legislature, in enacting § 173.13, did not intend to create a cause of action for private enforcement. *See* Def.Mem. of Law, p. 18 (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983)). This argument misses the mark. Plaintiffs' surviving causes of action are based not on the violation of a statute, i.e., § 173.13, but rather on the negligent performance of voluntarily assumed duties. The City, in effect, assumed the responsibility of rescuing by boat a swimmer being pulled out to sea. While under no initial obligation to do so, once undertaken, the City was required to effectuate the rescue properly, especially when, as here, the swimmer was relying on the rescue boat to bring him safely home, rather than attempting to swim to shore on his own. *Cf.* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56, at 375–77 (5th ed.1984). Plaintiffs have submitted sufficient evidence from which a reasonable jury could conclude that the City was negligent in the discharge of its voluntarily assumed obligations.

Nor is there any merit to defendant's argument that the municipal acts at issue were purely "discretionary" acts entitling the City to common law tort immunity. Governmental immunity attaches under New York law "when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Haddock v. City of New York*, 75 N.Y.2d 478, 484, 554 N.Y.S.2d 439, 443, 553 N.E.2d 987 (1990). Although the line between discretionary and ministerial acts "may sometimes blur," the New York Court of Appeals in *Haddock* explained that "discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Id.* (citation and quotations omitted).

Here, it need not be determined whether the City's actions in voluntarily assuming non-statutory responsibilities above and beyond its general duty of inspection and abatement were discretionary or ministerial because the City has offered no evidence that any expert judgment in policy matters was exercised. In dealing with a report of lead poisoning in a private apartment with a young child, DOH was following long established standard nutrition practice and cleaning procedures for coping with lead. As the Court of Appeals stated in *Haddock*, "[t]he difficulty with the City's contention that it is entitled to a cloak of immunity for the discretionary decision [to voluntarily assume non-statutory responsibilities] is that there is no evidence that [prior to its assumption of inspection and counseling duties] the City in fact made any such decision or exercised any such discretion." *Id.* at 485, 554 N.Y.S.2d 439, 553 N.E.2d 987. There is simply no indication that City officials engaged in any kind of reasoned discourse or exercised any judgment concerning how to respond to the lead hazard in plaintiffs' apartment. Moreover, the City has, in

adopting the statute, removed any discretion from its officials. Here, the City has already made a determination which is merely being implemented.

In addition, despite the existence of common law municipal tort immunity for discretionary acts, New York courts have allowed private suits for personal injury due to lead poisoning to proceed where the municipality's conduct created a special relationship between the municipality and the injured plaintiff. *See Bargy v. Sienkiewicz*, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (3d Dept.1994); *Thomas v. City of New York*, 180 A.D.2d 588, 580 N.Y.S.2d 1008 (1st Dept.1992); *New York City Coalition to End Lead Poisoning v. Koch*, 138 Misc.2d 188, 197, 524 N.Y.S.2d 314, 320 (Sup.Ct.N.Y. County 1987), *aff'd. in a summary order*, 139 A.D.2d 404, 526 N.Y.S.2d 918 (1st Dept.1988). Accordingly, the common law tort immunity defense will not avail defendant here, and defendant's motion for summary judgment on plaintiffs' second claim is denied.

### (3)

### Plaintiffs' Remaining Claims

Plaintiffs' fourth claim is for negligence against the building owners and against the City for apartments "to which they administer federal funds." Def. R.56.1, Exh. A (Complaint, ¶ 69). As such, this claim does not state a basis upon which relief can be granted, as plaintiffs have conceded that no federal funds were administered to or used in plaintiffs' former apartment. *See, e.g.,* Def. R.56.1, Exh. D (Pl.Let. to Judge Trager, dated 10/15/98). To the extent that this claim is not based upon the City's use of federal funds in plaintiffs' former apartment, it is duplicative of plaintiffs' second claim which pleads a cause of action for negligent assumption of voluntarily assumed duties. Accordingly, defendant's motion for summary judgment on the fourth cause of action is granted.

█ Plaintiffs' sixth cause of action alleges that defendant New York City is liable to plaintiffs under a nuisance theory for "lead contamination in the dwelling *provided by defendants* [which has] create[d] an unreasonable invasion of the living conditions of plaintiffs." Def. R.56.1, Exh. A (Complaint, ¶ 81). This claim too must be dismissed. First, there is no cause of action for nuisance under the common law where the condition complained of did not arise from outside of the subject premises. *See Graham v. Wisenburn*, 39 A.D.2d 334, 336, 334 N.Y.S.2d 81, 83 (3d Dept.1972). Thus, unless a statutory cause of action exists upon which the City may be held liable, defendant's motion for summary judgment on the nuisance claim must be granted. Plaintiffs contend that a statutory cause of action sounding in nuisance exists for violation of The New York City Administrative Code and Health Code, but do not cite to any specific section of either code upon which this claim is alleged to be based. Furthermore, this claim is strikingly similar to plaintiffs' breach of statutory duty claim on which summary judgment has already been granted to the City.

█ In any event, even assuming that the presence of the requisite level of lead in a plaintiff's apartment is sufficient to satisfy the requirements of a distinct statutory nuisance claim against the owner of an apartment under either code, there is no indication that the City either owned or provided plaintiffs with their apartment. In fact, the evidence conclusively establishes that the City neither owned, provided, nor financed plaintiffs' apartment in any way. Since the City did not own, finance or provide plaintiffs with their apartment, the nuisance claim appears to be against plaintiffs' landlords, and not the City. *Cf. Bernard v. 345 East 73rd Owners Corp.*, 181 A.D.2d 543, 544, 581 N.Y.S.2d 46 (1st Dept.1992) (cause of action did not lie against party that lacked control over apartment from which noises emanated and did not make noises); *New York Telephone Co. v. Mobil Oil Corp.*, 99 A.D.2d 185, 188–89, 473 N.Y.S.2d 172, 174 (1st

Dept.1984) (owner of land ceases to be liable for nuisance after conveying land to new owner "at such time as the new owner has had a reasonable opportunity to discover the condition by making prompt inspection and necessary repairs."). Accordingly, defendant's motion for summary judgment on the sixth or nuisance cause of action is granted.

■ Plaintiffs' seventh cause of action alleges that the City tortiously misrepresented to plaintiffs that it was "safe" for plaintiffs to remain in their apartment while it was being repaired by their landlord, and that defendant made this representation knowing that it was false, and intending that plaintiffs would rely on such false representations, which plaintiffs, in fact, did. *See* Def. R.56.1, Exh. A (Complaint, ¶¶ 86, 88–91). Plaintiffs have failed to offer any evidence in support of this claim of knowing misrepresentation. Specifically, there is no evidence that any agent of the DOH or New York City affirmatively represented to plaintiffs that it was safe to remain in the 46th Street apartment. While such a representation might be inferred from the conduct of DOH employees, there is absolutely no evidence that any DOH employee made any such representation, even by omission, *knowing that it was false.* Accordingly, defendant's motion for summary judgment on the seventh or tortious misrepresentation cause of action is also granted.

■ Finally, plaintiffs also allege claims for negligent and intentional infliction of emotional distress. Under New York law, "[i]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Lauer v. City of New York,* 240 A.D.2d 543, 544, 659 N.Y.S.2d 57, 58 (2d Dept.1997) (citing *Wheeler v. State,* 104 A.D.2d 496, 498, 479 N.Y.S.2d 244, 247 (2d Dept.1984); *LaBelle v. County of St. Lawrence,* 85 A.D.2d 759, 761, 445 N.Y.S.2d 275, 278 (3d Dept.1981) (additional citations omitted)). Accordingly, plaintiffs' cause of action for intentional infliction of emotional distress must be dismissed.

The issue presented by plaintiffs' claim for negligent infliction of emotional distress is, however, not so simple. As a threshold matter, it is not clear whether both plaintiffs are claiming damages for emotional distress. To the extent that plaintiffs allege such a cause of action on behalf of infant plaintiff's mother, Teresa Franco, such action is time barred as plaintiffs' complaint was not filed within "one year and ninety days [from] the happening of the event" on which the claims in question are based, *see* N.Y.Gen.Mun.Law § 50–i(c), and Ms. Franco is not entitled to a toll for infancy or insanity.

■ To the extent that plaintiffs allege a claim for negligent infliction of emotional distress on behalf of infant plaintiff, this claim must also be dismissed. A plaintiff claiming negligent infliction of emotional distress under New York law must establish that she or he: (1) is "[o]ne to whom a duty of care is owed," (2) sustained harm "solely as a result of an initial, negligently-caused psychological trauma," and (3) suffered "ensuing psychic harm with residual physical manifestations." *Johnson v. State,* 37 N.Y.2d 378, 381, 372 N.Y.S.2d 638, 641, 334 N.E.2d 590 (1975) (citations omitted). Here, as discussed above, plaintiffs have sufficiently established the existence of a voluntarily assumed duty to advise, inspect and abate that went beyond the scope of any duty imposed upon the City by statute. However, plaintiffs have submitted scant evidence to support their claim that defendant's negligence caused infant plaintiff harm in the form of psychological trauma, not duplicative of plaintiff's lead poisoning injury, much less that infant plaintiff exhibited physical manifestations of such psychic trauma. In the absence of such non-duplicative evidence, infant plaintiff's claim is, at best, moot. Moreover, plaintiffs appear to have abandoned their negligent infliction of emotional distress claims, not even addressing those claims in

their memorandum of law. Accordingly, defendant's motion for summary judgment on infant plaintiff's cause of action for negligent infliction of emotional distress is also granted.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment for plaintiffs' alleged failure to comply with the applicable statute of limitations is denied with leave to renew if the Court of Appeals adopts the position of the Second Department in *Henry v. City of New York*, 244 A.D.2d 93, 676 N.Y.S.2d 616 (2d Dept. 1998), or a similar basis that would bar plaintiff's cause of action. Defendant's motion for summary judgment is granted as to plaintiffs' first, third, fourth, fifth, sixth, seventh and eighth causes of action. Summary judgment is denied as to plaintiffs' second cause of action.