OPINION OF THE COURT
Louis C. Benza, J.
Based on the facts stated, defendant City of New York moves for summary judgment dismissing all claims and cross claims in the above-captioned action. Infant plaintiffs’ mother, on her own behalf as well as natural guardian of infant plaintiffs, cross-moves for an order amending the notice of claim nunc pro tunc originally filed for infant plaintiffs Melissa and Stephanie Ubiera and to file a claim nunc pro tunc for infant Joander Ubiera and herself.
Pending determination of that motion and cross motion, the three infant plaintiffs, by their mother and natural guardian, move to amend the complaint filed in this action to add an additional cause of action against defendant City of New York alleging breach of a special duty.
On March 22, 1993, the apartment in which infants Melissa and Stephanie Ubiera and their mother lived burned down. Defendant City of New York relocated the family to a shelter known as the Ruth Fernandez Family Residence (shelter). The shelter was owned by Housing Now Company, Inc. (owner) and *848 managed by South Bronx Community Management Co., Inc. (manager). It was the usual procedure of the manager to repair and paint each apartment before a new tenant moved in.
As a requirement for admission to the shelter, residents must undergo a physical examination. On April 12, 1993, 15 days after moving into the shelter, Melissa and Stephanie were diagnosed with elevated blood levels as a result of lead poisoning. Stephanie’s BPb blood level read at 17 ug/dL and Melissa’s at 38 ug/dL. These results were reported to the New York City Department of Health (DOH) on November 24, 1993 — 7 months after the initial diagnosis. No reason is given for the delay.
On August 12, 1993, DOH inspected the shelter apartment (2B) and found lead contamination. The family was moved to another apartment in the shelter. All told, the family resided in 2B for a period of 41/2 months.
After the children had resided in apartment 2B for three months, the second blood test was taken at Lincoln Hospital on June 30, 1993, where Melissa’s BPb blood lead values were 27 ug/dL and Stephanie’s were 17 ug/dL based on Montefiore laboratory reports dated July 26, 1993, which were sent to DOH.
DOH ordered the shelter to abate the lead nuisance on August 25, 1993 — approximately one month from the initial report of July 7, 1993. An inspection by DOH found that the violations were removed on September 30, 1993. There are no allegations that Melissa and Stephanie suffered any poisoning in their stay in the second apartment assigned to them by the shelter.
After a total of five months in the shelter, the family moved to 627 East 221st Street, apartment 1, Bronx, New York, on January 28, 1994. The move was made as a result of the family receiving a section 8 grant, which paid for most of the rent at the new apartment.
According to the aforementioned Montefiore laboratory reports, on March 18, 1994 (the closest date to her moving into the new apartment) Melissa’s blood BPb values were 20 ug/dL and Stephanie’s were 8 ug/dL on March 29, 1994. The blood lead values had decreased from 38 ug/dL to 20 ug/dL for Melissa and from 17 ug/dL to 8 ug/dL for Stephanie.
While the family resided at 627 East 221st Street, infant plaintiff Joander was born on January 29, 1994. It is undisputed that up to this point in time, infant plaintiffs Melissa and Stephanie had not been subject to exposure to lead particles resulting from ongoing lead abatement activities.
*849 DOH, through its Public Health Advisor (PHA), continued to monitor and counsel the Ubi era family on nutrition, diet, environment and medical follow-ups of the lead condition of the infants. On April 25, 1995, when Joander was 15 months, she was diagnosed with lead poisoning with a level of 25 ug/ dL.
On June 2, 1995, DOH ordered the landlord to abate the nuisance created by the peeling lead paint. An environmental inspection report dated August 9, 1995 states all violations with exceptions noted were abated. Another report dated December 28, 1995 states all violations removed.
The record reads that the PHA visited plaintiffs at 627 East 221st Street twice (on June 16, 1994 and October 19, 1994) before it was determined that the apartment required lead paint abatement and one time after the discovery of infant Joander’s lead poisoning (on May 18, 1995). All of these visits were made to counsel the family to clean the rooms, mop up the floors, wipe down the, window sills, tape up exposed areas and convey the importance of a safe environment, including advising of the sources of lead poisoning and ways to prevent further exposure, disejuss the environmental effects of the disease, the necessity off medical follow-up and other aspects of lead poisoning and nutritional health. During these visits, the PHA would make visual inspections of the apartment.
Plaintiffs contend ;hat, based on the City’s placement of plaintiffs in and its involvement with the Fernandez shelter, the City put itself in tne position of an owner, thereby creating a duty under Administrative Code of the City of New York § 27-2013 (h) (added tiy Local Laws, 1982, No. 1 of City of NY [Local Law 1]) to protect infant plaintiffs from being exposed to lead paint. In their subsequent motion, plaintiffs contend that by the City’s undertaking in following up on infant plaintiffs’ condition and counseling Mr. and Mrs. Ubiera on hygienic steps to improve the children’s health and prevent further poisoning, as well as its visual inspection of plaintiffs’ new apartment, the City exceeded its general duty of inspection and abatement, creating a special duty as to the infant plaintiffs to use due care to protect them from additional lead poisoning. Further, plaintiffs contend that the duty owing to infant plaintiffs was breached by the City when DOH’s agents failed to warn plaintiffs that if they remained in the East 221st Street apartment while abatement of the lead condition was ongoing, the children could be further injured by consuming particles of lead and coming in contact with lead contaminated materials during the removal process.
*850 Plaintiffs contend that whether a duty to warn was required due to the creation of the special relationship raises a question of fact that could only be decided by a jury. Plaintiffs concede that defendant City has no responsibility for the poisoning sustained by infant plaintiffs Melissa and Stephanie, which occurred in the first apartment which plaintiffs were burned out of. In summary, all of plaintiffs’ contentions can be synthesized into three categories of liability.
First, that defendant City’s activities in the operation of the shelter amounted to ownership of the premises, thus making the City liable to plaintiffs for violating the mandate of Local Law 1 — specifically New York City Health Code (24 RCNY) § 173.13.
Second, that section 173.13 created a special relationship for the express benefit of plaintiffs and that the duty owed to plaintiffs as a result of that special relationship was breached by the City.
Third, that defendant City’s conduct and activities in performing, monitoring, inspecting and counseling plaintiffs went beyond the requirement of the statutes, thus creating a duty upon defendant City through its voluntary acts to protect plaintiffs from further lead poisoning.
As to plaintiffs’ first contention, the City has established that it is not an owner of any of the premises in which the lead poisoning occurred. Plaintiffs also have not submitted any evidence which raises a question of fact that defendant City’s activities in placing the family in the shelter owned and operated by codefendants Housing Now Company, Inc., and South Bronx Community Management Co., Inc., or in the premises receiving section 8 housing subsidies, were anything more than performance of governmental functions to give assistance to burned-out and homeless families. Such activities are immune from liability as an exercise of traditional government functions undertaken as part of defendant City’s general police procedure to protect the safety of the public. (See, Sebastian v State of New York, 93 NY2d 790 [1999].)
Further, absent ownership or control of the property involved by defendant City, the statute and code sections relied upon by plaintiffs to establish liability against defendant City are not applicable as such statute and regulations apply only to owners of multiple dwellings. (See, Administrative Code § 27-2013 [h]; Local Laws, 1982, No. 1 of City of New York; see also, Juarez v Wavecrest Mgt. Team, 88 NY2d 628 [1996]; Colon v New York City Hous. Auth., 165 Misc 2d 348 [Sup Ct, NY County 1995].)
*851 Plaintiffs’ assertion that the poisoning of infant plaintiffs Melissa and Stephanie occurred in premises which, although not owned by defendant City, its participation in the financing and operation of the premises (including approval of key Ruth Fernandez Family Residence shelter employees of codefendants) amounted to “ownership,” is unpersuasive. The participation of the City was mandated by its government role in the housing of homeless people and did not, under the circumstances presented, amount to a proprietary interest in the shelter. (See, Bowles v City of New York, 154 AD2d 324 [2d Dept 1989].)
Absent any credible evidence raising a question of fact that the City knew or should have known that the shelter apartment was in violation of the health laws concerning lead abatement at the time plaintiffs were placed in said apartment, the issue of common-law negligence against defendant City is precluded based on the doctrine of sovereign immunity. (See, Office Park Corp. v County of Onondaga, 64 AD2d 252 [4th Dept 1978].)
Plaintiffs’ Second Contention — Special Duty Established By Statute
Absent a special relationship creating a municipal duty to an individual or a particular class of individuals, liability cannot be imposed on any governmental agency for failure to enforce a statute or regulation. (See, Kenavan v City of New York, 70 NY2d 558 [1987].) A special relationship exists when a governmental entity breaches a duty brought about by: (1) a violation of a duty commanded by a statute enacted for the special benefit of particular individuals; (2) voluntarily assuming a duty and the individuals gaining benefit from that duty justifiably relying upon its proper exercise; or (3) assuming positive direction and control over a known, blatant and dangerous safety violation. (See, Garrett v Holiday Inns, 58 NY2d 253 [1983].)
In this case, plaintiffs contend that a special relationship between the City and plaintiffs exists as a result of New York City Health Code (24 RCNY) § 173.13 and that the City may be held liable to them for violating that section. The language of section 173.13 indicates that the statute was created for the benefit of all residents of New York City who live in a dwelling as defined in the statute and not for the special benefit of any specific class of people. (See, O’Connor v City of New York, 58 NY2d 184 [1983]; Jaramillo v Callen Realty, 200 AD2d 425 [1st Dept 1994].)
*852 The introductory notes to article 173 emphasize that the goal of the regulation is to protect all residents in New York City against the hazards caused by lead-based paint. (See, 24 RCNY art 173.) If the drafters of the Health Code intended to protect, specifically, children from lead-based paint poisoning, they could have easily made that clear in the regulation. (See, Lindsay v New York City Hous. Auth., 1999 WL 104599, 1999 US Dist LEXIS 1893 [ED NY, Feb. 24, 1999, Gleeson, JJ.) As the statutory protection of article 173 was established for the general public and not for the special benefit of a specific class of individuals such as plaintiffs, no special duty arises from the statute to the benefit of plaintiffs. (See, Boland v State of New York, 218 AD2d 235 [3d Dept 1996].)
The question to be answered in determining the merit of plaintiffs’ third contention is whether the City voluntarily assumed a duty upon which plaintiffs relied and was subsequently damaged by its breach of said duty.
Plaintiffs contend that defendant City’s monitoring, inspecting and counseling activities were beyond the requirements of its general duty of inspection and abatement. (See, Bargy v Sienkiewicz, 207 AD2d 606 [3d Dept 1994].) Having exceeded its responsibility, it voluntarily assumed a duty to use due care for the benefit of plaintiffs. This duty of due care included the duty to warn plaintiffs as to the dangers of continuing lead poisoning to children who remain in the apartment during lead abatement. (See, Valencia v Lee, 55 F Supp 2d 122 [ED NY 1999].)
The Valencia decision (supra) held that the City’s monitoring of the children after discovering a high lead level in their blood due to lead poisoning was voluntary, creating a special relationship and raising a question of fact as to whether the duty to warn the Valencias to the dangers of continuing lead poisoning to the children while remaining in the apartment during the abatement process was breached. Although the court did not specifically make any analysis for the basis of its conclusion that the City’s monitoring was voluntary, in this case the law in existence at the time of the poisoning of the infant plaintiffs excludes any finding that defendant City’s activities in monitoring infant plaintiffs could be considered voluntary.
The mandatory language of Public Health Law § 1370-a requires that:
“1. [t]he department shall establish a lead poisoning prevention program. This program shall be responsible for establishing and coordinating activities to prevent lead poisoning and to *853 minimize risk of exposure to lead. The department shall exercise any and all authority which may be deemed necessary and appropriate to effectuate the provisions of this title.
“2. The department shall:
“(a) promulgate and enforce regulations for screening children and pregnant women for lead poisoning, and for follow up of children and pregnant women who have elevated blood lead levels;
“(b) enter into interagency agreements to coordinate lead poisoning prevention, exposure reduction, identification and treatment activities and lead reduction activities with other federal, state and local agencies and programs;
“(c) establish a statewide registry of children with elevated lead levels provided such information is monitored as confidential except for
“(i) disclosure for medical treatment purposes; and (ii) disclosure of non-identifying epidemiological data; and
“(d) develop and implement public education and community outreach programs on lead exposure, detection and risk reduction.”
In furtherance of this mandate, the City’s monitoring of the infant plaintiffs cannot be said to be voluntary. The finding of a special relationship in Bargy (supra), cited by the Valencia court, is based on “the County’s response to the reports of the infants’ elevated blood lead levels may have exceeded its general duty of inspection and abatement.” (207 AD2d, supra, at 609.)
In Bargy (supra), the county inspector undertook voluntarily to inspect the plaintiffs’ vacant apartment undergoing abatement to determine if it was safe for plaintiffs to move back in after abatement was completed. The inspection, which was not required as part of the inspector’s official response, was performed negligently and plaintiffs were further poisoned when they relied on the inspector’s assurance and moved back into the apartment.
Here, no voluntary assumption was undertaken by defendant City. In the instant case, the City’s monitors advising the Ubiera family of the necessity of covering all objects in the area where abatement was ongoing, washing, cleaning and mopping of dust and covering peeled paint areas as well as continued washing of hands, were all taken as part of preventing continued lead poisoning of the children in compliance with section 1370-a. DOH, the governmental agency responsible for *854 the administration of said statute, in undertaking the fulfillment of its mandate, established the procedure followed by the PHA in the instant case. On this issue, it has been held “ ‘[c]ourts and juries are not to say [municipal corporations] shall be punished in damages for not giving to the public more complete protection; for . . . that would be to take the administration of municipal affairs out of the hands to which it has been entrusted by law.’ ” (See, Weiss v Fote, 7 NY2d 579, 584 [I960].)
Therefore, the activities of defendant City relied upon by plaintiffs to have created the voluntary assumption of a special duty are not warranted by the facts of this case. It should also be noted that defendant landlord gave the Ubiera family the option to move and they refused.
Plaintiffs’ motions and cross motions are denied in their entirety. Defendant City of New York’s motion to dismiss all claims against it is granted. (See, Asif v Marvit, NYLJ, Apr. 11, 2000, at 26, col 4 [Sup Ct, Kings County, Bruno, J.].)