**Christian R. VALENCIA, an Infant By his Mother and Natural Guardian, Teresa FRANCO, Plaintiff–Appellee,**

v.

**Sung M. LEE and Shiu Chun Lee, Defendants,**

**The City of New York, Defendant–Appellant.**

Docket No. 01–7327.

United States Court of Appeals, Second Circuit.

Argued: Jan. 23, 2002.

Decided: Jan. 21, 2003.

John M. Daly, Yonkers, New York (John E. Fitzgerald, Eugene S.R. Pagano, Alberto Casadevall, Fitzgerald & Fitzgerald, Yonkers, New York, on the brief), for Plaintiff–Appellee.

Margaret G. King, Assistant Corporation Counsel, New York, New York (Michael D. Hess, Corporation Counsel of the City of New York, Larry A. Sonnenshein, Thomas G. Merrill, Dwayne C. Turner, Assistant Corporation Counsel, New York, New York, on the brief), for Defendant–Appellant.

Before: .NEWMAN and KEARSE, Circuit Judges, and RAKOFF, District Judge *.

KEARSE, Circuit Judge.

Defendant City of New York (the "City") appeals from a judgment entered in the United States District Court for the Eastern District of New York, following a bench trial before David G. Trager, *Judge*, ordering the City to pay plaintiff Christian R. Valencia ("Christian"), an infant represented by his mother and natural guardian, Teresa Franco (collectively "plaintiffs"), $385,000, on the ground that the City had created a special relationship with Christian and had breached its duty to use due care with respect to his health. On appeal, the City contends principally that the district court erred in ruling (a) that the City owed a duty to plaintiffs, (b) that plaintiffs acted in reliance on any undertaking by the City, and (c) that any injury suffered by plaintiffs was attributable to the City. Because the federal claims asserted by plaintiffs were abandoned at a relatively early stage of this case, leaving only state-law claims against the City, one of which raises complex and

---

* Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

unsettled questions of New York law, we conclude that the district court should not have exercised supplemental jurisdiction over the state-law claims. We therefore vacate the judgment, with instructions to the district court to remand the action to the state court from which it was removed.

## I. BACKGROUND

To the extent pertinent here, the events and the early proceedings in this litigation, as set forth in two opinions of the district court, *Valencia v. Lee,* 55 F.Supp.2d 122 (1999) (*"Valencia I "*) (granting in part and denying in part the City's motion for summary judgment), and *Valencia v. Lee,* 123 F.Supp.2d 666 (2000) (*"Valencia II "*) (finding in favor of plaintiffs after trial), were as follows.

Christian was born in 1992. Until late 1995, he and Franco lived in a Brooklyn, New York apartment ("the apartment") owned and managed by defendants Sung M. Lee and Shiu Chun Lee (the "Lees" or the "landlords"). In 1993, medical tests revealed elevated levels of lead in Christian's blood. As required by New York law, those test results were reported to the City's Department of Health ("DOH").

On August 25, 1993, DOH sent two Public Health Sanitarians ("PHSs") to inspect plaintiffs' apartment. The PHSs took numerous lead readings and found 56 areas that tested positive for lead paint. They gave Franco a document explaining, *inter alia,* that her landlords would be sent a letter ordering them to rid the apartment of the lead paint within 10 days; that if the landlords did not comply, the City itself would have the lead abatement work done and bill the landlords; that the PHSs would continue to check the home until the abatement was completed; and that a DOH Public Health Advisor ("PHA") would visit the apartment to answer Franco's questions about lead poisoning and Christian's medical care.

On the following day, as well as on three other occasions during the next two years, a PHA visited Franco to give her counseling. The PHAs advised Franco as to, *inter alia,* an appropriate diet for Christian, the appropriate manner and timing of cleaning the apartment, Christian, and his toys, and the need for continued blood testing.

During a nearly three-year period following the PHSs' initial visit to the apartment in August 1993, little was done to accomplish the required lead abatement. In September or October 1993, the landlords placed plywood over some of the problem surfaces; this had no substantial abating effect. In November 1993, the City took charge of the job; but, despite numerous additional inspections by PHSs, the necessary work was not completed for more than 2½ years. On November 1, 1995, Franco and Christian moved out of the apartment; the lead abatement work still was not close to completion.

### A. *The Present Lawsuit*

In 1996 and 1997, in a Head Start program and in school, Christian exhibited significant learning and behavioral problems. He continued to have such problems through June 1999, and as a result, he was required, *inter alia,* to repeat the second grade. Franco commenced the present action in New York State court in May 1997 on behalf of Christian against the Lees and the City, alleging that Christian's problems were the result of the lead paint in the apartment, the failure to have the lead removed, and the failure to provide adequate warnings as to the hazards of Christian's continued exposure to lead paint. The complaint alleged two federal claims, to wit, (a) that the City had violated regulations promulgated by the United States Department of Housing and Urban Development under the Lead-based Paint

Poisoning Prevention Act, 42 U.S.C. § 4822 ("LPPPA"); and (b) that, under color of state law, plaintiffs had been deprived of rights secured by federal law and the Civil Rights Act of 1871, 42 U.S.C. § 1983. The complaint also alleged several state-law causes of action, including claims of negligence, nuisance, breach of contract, misrepresentation, infliction of emotional distress, and failure to comply with and enforce local laws. Based on the presence of federal questions, the City promptly removed the action to federal court.

In the district court, the City answered the complaint in June 1997, and discovery ensued. The landlords failed to answer the complaint, and a default judgment was entered against them in July 1998. In October 1998, with discovery nearly completed, the City informed the district court that it intended to move for summary judgment dismissing all of the claims asserted against the City. In response, plaintiffs stated their opposition to the dismissal of state-law claims, but they "conceded that there [wa]s insufficient evidence to support the federal law claims." *Valencia I*, 55 F.Supp.2d at 125; *see* Letter from Alberto Casadevall, counsel for plaintiffs, to Judge Trager dated October 15, 1998, at 1 ("Based on discovery had to date plaintiffs are not prepared to pursue at trial any claims against defendant City ... based upon the ... 'LPPPA'[ ]. Similarly, plaintiffs are not prepared to pursue at trial any claims against defendant City ... alleging a denial of federal rights under 42 U.S.C. § 1983.... Thus, plaintiffs are only prepared to try issues involving state and local laws.").

The district court held a pre-motion conference with the parties on October 28, 1998. The court indicated that although plaintiffs had abandoned their federal claims, the court would exercise supplemental jurisdiction over their state-law claims and would not remand the case to state court. In January 1999, the City served its motion for summary judgment, seeking dismissal of all of the claims asserted against it. Plaintiffs, consistent with their prior position, opposed dismissal of the state-law claims against the City and abandoned their federal claims.

In June 1999, the district court granted summary judgment dismissing the federal claims, based on plaintiffs' abandonment of those claims, *see Valencia I*, 55 F.Supp.2d at 125, and granted summary judgment dismissing all of the state-law claims except the claim that the City had failed to enforce local laws, *see id.* at 136. Following a discussion of whether plaintiffs could succeed on the failure-to-enforce claim, including the issue of whether the City owed plaintiffs a duty under New York law to use reasonable care in enforcing municipal regulations, *see id.* at 129–34, the district court concluded that triable issues of fact existed as to whether the City had created a special relationship with plaintiffs and whether it owed plaintiffs a duty because of that relationship, *see id.* at 132–34. The court ruled that the City was not entitled to common-law immunity with respect to such a claim.

## B. *The District Court's Decision After Trial*

In July and August 2000, the district court conducted a seven-day bench trial on the claim that the City had created a special relationship with Christian and had breached its duty to use due care with respect to his health. In December 2000, the court issued its decision, *Valencia II*, 123 F.Supp.2d 666–94, finding that the City had negligently failed to fulfill its duty to protect Christian from lead poisoning and that that failure was a substantial factor in causing Christian's difficulties in school.

■ As to the existence of a duty on the part of the City, the court stated that, although "[t]he City is not normally liable for failing to properly fulfill its duties to the general public[, t]he New York Court of Appeals has carved out an exception to this rule ... where the City creates a 'special relationship' with the plaintiff." 123 F.Supp.2d at 674. The district court noted that in *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 460 N.Y.S.2d 774, 447 N.E.2d 717 (1983) (*"Garrett"*), the New York Court of Appeals had set out three tests for whether such a special relationship existed:

> This "special relationship" can be established in one of three ways: (1) where the City "violated a duty commanded by a statute enacted for the special benefit of particular persons;" (2) where the City "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby;" or (3) where the City "assume[d] positive direction and control under circumstances in which a known, blatant and dangerous safety violation exist[ed]." *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 261–62, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717 (1983). Once such a "special relationship" is created, the City is under an obligation to act reasonably, and will be liable where its actions fail to meet that standard.

*Valencia II*, 123 F.Supp.2d at 674. The court determined that the first *Garrett* test was not met here, but that the second and third tests were met.

The court explored at length the elements of the second type of special relationship described in *Garrett*, as discussed in *Cuffy v. City of New York*, 69 N.Y.2d 255, 260, 513 N.Y.S.2d 372, 375, 505 N.E.2d 937 (1987), *i.e.*, (1) the municipality's assumption, through promises or actions, of an affirmative duty to act on behalf of the party who was injured, (2) municipal agents' knowledge that inaction could lead to harm, (3) direct contact between the municipal agents and the injured party, and (4) the injured party's justifiable reliance on the municipality's affirmative undertaking. *See Valencia II*, 123 F.Supp.2d at 675–80. In finding that "[t]he first element—the assumption of a voluntary duty ... where the City 'exceed[s] its general duty of inspection and abatement'" had been met in the present case, *id.* at 675, the district court quoted and relied principally on the decision in *Bargy v. Sienkiewicz*, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (3d Dep't 1994) (*"Bargy"*). In *Bargy*, in opposition to a summary judgment motion by the defendant county, the plaintiff adduced evidence that she and her family had twice vacated their apartment in order to facilitate lead abatement; that after each such move, they were assured by a county agent that the abatement had been completed; and that in reliance on those assurances they returned to the apartment. The abatement had not been completed however, and after each return, one of the plaintiff's sons tested positive for lead poisoning. The Appellate Division concluded that, on the evidence proffered by the plaintiff, the county "may have exceeded its general duty of inspection and abatement" and "may have voluntarily assumed a particular duty to use due care for the benefit of the infants ... to protect them from lead poisoning." *Bargy*, 207 A.D.2d at 609, 615 N.Y.S.2d at 522. The court thus affirmed the denial of the county's motion for summary judgment.

The communications between plaintiffs and the City agents in the present case, however, did not entirely parallel those between the plaintiffs and the county agent in *Bargy*, and the City argued that its conduct here, in conducting inspections and giving advice, had been required by state law. The district court rejected that contention. It concluded that, "through its

promises and actions, the City voluntarily assumed a duty to protect Christian from harm resulting from lead poisoning," *Valencia II*, 123 F.Supp.2d at 675, *i.e.*, that the City had created a special relationship that imposed on it "a duty to properly safeguard Christian from further lead poisoning," *id.* at 680.

The court found credible Franco's testimony that she "believed that as long as she followed the advice of the PHAs and PHSs, Christian's health would not be in jeopardy," and that if she had been informed of the dangers of remaining in the apartment she would have moved sooner. *Id.* at 671. The court found that Franco had relied on representations by the City and that her reliance was justifiable.

The district court also found that "[t]he City affirmatively took control" of "a known dangerous condition by giving advice, and by doing so created a special relationship" under the third *Garrett* test. *Id.* at 681. The court further held that "[h]aving formed a special relationship with Christian" under either the second or the third *Garrett* test, "the City was under a duty to act reasonably." *Id.* The court found, however, that the City had failed to do so because it failed to inform Franco that "remaining in the apartment would leave Christian at risk even if she followed all of the[City's] advice." *Id.*

On the issue of causation, the court credited the opinions of plaintiff's experts over those proffered by experts called by the City, *see id.* at 684 & n. 12, 687–92, and found that it was "more probable than not that Christian's lead poisoning was a substantial factor in causing [Christian's] deficiencies and his behavioral problems," *id.* at 692; *see also id.* at 692–93 ("[T]he City's negligent conduct in failing to protect Christian from lead poisoning was a substantial factor in causing his difficulties in school, and the City is liable for the damages caused thereby."). The court deter-

mined that the appropriate amount of damages was $385,000, reflecting "the costs of remediation necessary to allow Christian to catch up and keep up in school" with the help of private schools, tutoring, and counseling. *Id.* at 693–94. Judgment was entered against the City in that amount. Plaintiffs did not further pursue their claims against the defaulting landlords, and the case was closed.

## II. DISCUSSION

On this appeal, the City has argued principally that the district court erred in its ruling that the City owed plaintiffs a duty to protect Christian against lead poisoning. It also challenges the court's findings as to reliance by plaintiffs on any undertakings by the City, the justifiability of such reliance, and causation of injury. At oral argument, this Court questioned the propriety of the federal courts' resolution of the unsettled questions of New York law, asking why it was a proper exercise of the district court's discretion, when plaintiffs had abandoned their federal claims in advance of the City's summary judgment motion, to exercise supplemental jurisdiction over the remaining state-law claims. For the reasons that follow, we decline to reach the merits issues raised on this appeal, for we conclude that the district court's retention of jurisdiction over the state-law claims was an abuse of discretion.

■■■ A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367 (2000). Subsection (a) of that section provides, in pertinent part, that

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Subsection (c) provides, however, that

[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In providing that a district court "may" decline to exercise such jurisdiction, this subsection is permissive rather than mandatory. *See generally Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir.1998); *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996). Accordingly, we review the district court's decision to exercise such jurisdiction under an abuse-of-discretion standard. *See, e.g., Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2001); *Da Silva v. Kinsho International Corp.*, 229 F.3d 358, 364, 366 (2d Cir.2000); *Seabrook v. Jacobson*, 153 F.3d 70, 71–72 (2d Cir.1998); *Marcus v. AT & T Corp.*, 138 F.3d at 57. The proper scope of the district court's discretion, however, is not boundless.

■ The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–29, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("*Gibbs*").

The [*Gibbs*] Court stated that a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." 383 U.S. at 725, 86 S.Ct. 1130. The Court intended this standard not only to clarify, but also to broaden, the scope of federal pendent jurisdiction. . . .

At the same time, however, *Gibbs* drew a distinction between the power of a federal court to hear state-law claims and the discretionary exercise of that power. The *Gibbs* Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties.

*Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 349–50, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("*Cohill*"). The *Gibbs* Court stated that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726, 86 S.Ct. 1130. Thus,

in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct. 614.

Applying these principles, this Court has concluded in some cases that the district court did not abuse its discretion in exercising supplemental (or pendent) jurisdiction over state-law claims after the plaintiff's federal claims had been dismissed.

For example, in *Marcus v. AT & T Corp.*, we upheld the court's retention of jurisdiction after the federal claims had been dismissed "[b]ecause the remaining state law claims implicate[d] the doctrine of preemption." 138 F.3d at 57. In *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191–92 (2d Cir.1996), we found no abuse of discretion in the district court's exercise of supplemental jurisdiction where the dismissal of the federal claim had occurred just nine days before the scheduled start of trial. We reached the same conclusion in *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir.1990), where, by the time the federal claims were dismissed, discovery had been completed, the court had decided three dispositive motions, and the case was ready for trial, and where the state-law claims involved only settled principles, rather than legal questions that were novel.

█ In other cases, however, where the federal claims had been dismissed at a relatively early stage and the remaining claims involved issues of state law that were unsettled, we have concluded that the exercise of supplemental or pendent jurisdiction was an abuse of discretion. *See, e.g., Giordano v. City of New York*, 274 F.3d at 754; *Oliveira v. Frito–Lay, Inc.*, 251 F.3d 56, 64 (2d Cir.2001); *Seabrook v. Jacobson*, 153 F.3d at 71–73 (and cases discussed therein); *Fay v. South Colonie Central School District*, 802 F.2d 21, 34 (2d Cir.1986).

> Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts. This is particularly true if the federal claim on which the state claim hangs has been dismissed. *See Rounseville v. Zahl*, 13

F.3d 625, 631 (2d Cir.1994) (holding that, where the state claim required an application of state law that was potentially novel, the state claim was appropriately resolved in state court, and retention of the state claim after the dismissal of the federal claim "would be an inappropriate exercise of pendent jurisdiction and a waste of judicial resources"); *Morse v. Univ. of Vermont*, 973 F.2d 122, 127–28 (2d Cir. 1992) (holding that where state claims involved novel questions of state law, it was an abuse of discretion to exercise jurisdiction over the state claims after dismissing the federal claims).

*Seabrook v. Jacobson*, 153 F.3d at 72. In *Seabrook*, the district court and the parties had agreed to a voluntary dismissal of the plaintiffs' federal claims on the condition that the district court would retain jurisdiction to decide plaintiffs' claim that a portion of the New York City Administrative Code was invalid because it conflicted with a New York State statute. *See id.* at 71. Despite these agreements, and despite the fact that the case reached this Court after trial, we concluded that the district court's exercise of supplemental jurisdiction had been an abuse of discretion because "[t]he resolution of [the] state law claim in [the] case turn[ed] on a question of state law which not only [was] undecided, but which also require[d] a balancing of numerous important policies of state government." *Id.* at 73.

█ In the present case, plaintiffs' concession that they had no viable federal claims occurred in October 1998. Although most of the anticipated pretrial discovery had been completed, this was a relatively early stage of the case. No substantive motions had been filed; no judicial opinions had been issued; and the case was not yet ready for trial. The City's formal motion for summary judgment was not made until 1999. The district court's opinion in *Valencia I* was not

filed until June 1999. Trial did not take place until July and August 2000. And the district court's dispositive opinion in *Valencia II* was not filed until December 2000. Plainly there were judicial economies to be achieved by declining to exercise supplemental jurisdiction when plaintiffs expressly abandoned their federal claims in October 1998.

Further, the state-law claim that went to trial raised unsettled questions of New York law. Although the New York Court of Appeals in *Garrett* had laid down general principles for assessing whether a municipality had created with its inhabitants a special relationship that imposed on it a duty of care, that court had never applied those principles in a case in which the plaintiff alleged that a municipality, when giving advice and monitoring the progress of lead abatement in the course of attempting to enforce its health code and state law, had failed to give sufficient warnings of the hazards associated with continued residence in the premises during lead abatement.

The case principally relied on by the district court in *Valencia II* for the proposition that a lead-abatement-related duty exists was *Bargy*. In *Bargy*, however, the municipality not only had inspected the premises initially to determine whether lead abatement was needed, but also, after work was done, assured the plaintiff that it was safe to return to the apartment. *See* 207 A.D.2d at 607–08, 615 N.Y.S.2d at 521. It is hardly clear that the New York courts would find that a special relationship had been created, and hence that a duty existed, without such assurances.

Indeed, the decision in *Bargy* was distinguished in *Ubiera v. Housing Now Co.*, 184 Misc.2d 846, 709 N.Y.S.2d 910 (2000) ("*Ubiera*"), whose fact pattern is closer to that of the present case. In *Ubiera*, the state court concluded that the City's conduct in monitoring the course of lead

abatement in an apartment and rendering advice "on nutrition, diet, environment and medical follow-ups of the lead condition of the infants," 184 Misc.2d at 849, 709 N.Y.S.2d at 912, was required by N.Y. Pub. Health Law § 1370–a. The *Ubiera* court concluded that that conduct therefore did not create a special relationship between the City and the apartment's residents and hence did not give the City a duty of care. *See Ubiera*, 184 Misc.2d at 851–54, 709 N.Y.S.2d at 914–16. The court stated that

> [i]n the instant case, the City's monitors advising the Ubiera family of the necessity of covering all objects in the area where abatement was ongoing, washing, cleaning and mopping of dust and covering peeled paint areas as well as continued washing of hands, *were all taken as part of preventing continued lead poisoning of the children in compliance with section 1370–a.* DOH, the governmental agency responsible for the administration of said statute, in undertaking the fulfillment of its mandate, established the procedure followed by the PHA in the instant case. On this issue, it has been held "'[c]ourts and juries are not to say [municipal corporations] shall be punished in damages for not giving to the public more complete protection; for ... that would be to take the administration of municipal affairs out of the hands to which it has been entrusted by law.'" (*See Weiss v. Fote*, 7 N.Y.S.2d 579, 584, 200 N.Y.S.2d 409, 167 N.E.2d 63)....

*Ubiera*, 184 Misc.2d at 853–54, 709 N.Y.S.2d at 916 (emphasis added). The *Ubiera* court thus granted summary judgment in favor of the City.

Unlike the court in *Ubiera*, which was decided in May 2000, some two months before the trial of the present case, the district court in *Valencia II* rejected the City's contention that the inspections that were conducted and the advice that was

given to the present plaintiffs were required by § 1370–a (McKinney Supp.2000). That section required that DOH, *inter alia,* "establish a lead poisoning prevention program" that would "minimize risk of exposure to lead," N.Y. Pub. Health Law § 1370–a(1), and that it "promulgate and enforce regulations for screening children ... for lead poisoning, and for follow up of children ... who have elevated blood lead levels," and "develop and implement public education and community outreach programs on lead exposure, detection and risk reduction," *id.* §§ 1370–a(2)(a) and (d). The district court found that this "statute does not require the type of counseling and advice given in the present case." *Valencia II,* 123 F.Supp.2d at 676. In so ruling, the court analogized to *Florence v. Goldberg,* 44 N.Y.2d 189, 192–98, 404 N.Y.S.2d 583, 584–88, 375 N.E.2d 763 (1978), in which the New York Court of Appeals ruled that the City could be found liable for injuries suffered by a child struck by a car on his way home from school at a crossing where the city had regularly provided, but did not provide on the day in question, a crossing guard. The district court did not mention *Ubiera.*

The district court's conclusion in *Valencia II* that the City owed plaintiffs a duty of care hardly seems to rest on a sure footing, given the state-court's decision in *Ubiera.* We express no opinion here as to which view of New York law, as applicable to lead abatement situations, would be adopted by the New York Court of Appeals; and we do not suggest that differences in the factual circumstances of these two cases might not make both outcomes consistent with New York law as eventually determined by that Court. The issue of general tort liability for municipalities and the interplay between the responsibilities imposed by municipal law and those imposed by state law are fundamental and complex questions involving the balancing of important policies of state government,

and the resolution of unsettled questions of this type is best left to the courts of the state when the early disposition of all federal claims makes the federal court's resolution of such state-law claims unnecessary. Given plaintiffs' abandonment of all federal claims in this case long before any decision on the novel and complex issues of state law became necessary, we conclude that the district court's exercise of supplemental jurisdiction to decide plaintiffs' state-law claims against the City was an abuse of discretion.

## CONCLUSION

For the reasons discussed above, we vacate the judgment of the district court. Because this case was commenced in state court, the district court should remand the action to the state court in which it was originally filed. *See Cohill,* 484 U.S. at 357, 108 S.Ct. 614.

Each side shall bear its own costs of this appeal.