NYMEX v. ICE

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2006

Argued: November 16, 2006                    Decided: August 1, 2007)

Docket No. 05-5585-cv

————————

NEW YORK MERCANTILE EXCHANGE, INC.,

*Plaintiff-Counter-Defendant-Appellant*,

—v.—

INTERCONTINENTALEXCHANGE, INC.,

*Defendant-Counter-Claimant-Appellee*.

————————

B e f o r e :

KATZMANN, WESLEY, and HALL, *Circuit Judges*.

————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*)  granting defendant's motion for summary judgment, denying plaintiff's cross-motion for partial summary judgment, and declining to exercise supplemental jurisdiction. Affirmed.

Judge Hall, Circuit Judge, filed a separate opinion concurring in part.

————————

HERBERT C. ROSS, JR., Olshan Grundman Frome
Rosenzweig & Wolosky LLP, New York, NY; MARTIN I.

KAMINSKY, EDWARD T. MCDERMOTT, Pollack & Kaminsky, New York, NY; SHEPARD GOLDFEIN, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Plaintiff-Counter-Defendant-Appellant*

RICHARD H. KLAPPER, BRADLEY P. SMITH, Sullivan & Cromwell LLP, New York, NY; STEPHEN D. SUSMAN, SHAWN L. RAYMOND, Susman Godfrey L.L.P., Houston, TX, *for Defendant-Counter-Claimant-Appellee*

NICOLE GUERON, SARAH S. NORMAND, Assistant United States Attorneys, *of counsel, for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, *for Amicus Curiae United States of America in support of Defendant-Appellee IntercontinentalExchange, Inc.*

_____

KATZMANN, *Circuit Judge*:

This case calls upon us to decide whether the New York Mercantile Exchange, Inc. ("NYMEX") can enforce a copyright in the settlement prices it produces to value customers' open positions. We hold that even if these prices are created by NYMEX—a question we do not resolve—there has been no infringement because enforcing the copyright here would effectively accord protection to the idea itself. We also consider the district court's dismissal of IntercontinentalExchange, Inc.'s ("ICE") state law claims and conclude that it did not abuse its discretion in declining to exercise supplemental jurisdiction. The judgment of the district court is affirmed.

## I.

The New York Mercantile Exchange, Inc. is an exchange for the trading of futures and options contracts for energy commodities. It operates a physical trading floor in New York City

2

where brokers and traders transact. Two of its most successful futures contracts are those for Henry Hub natural gas and West Texas Intermediate crude oil. IntercontinentalExchange, Inc. operates an electronic, Internet-based, trading market for trading of physical commodities and over-the-counter derivative contracts.

A futures contract requires the delivery of a commodity at a specified price at a specified future time, though most contracts are liquidated before physical delivery occurs. For each day when the contract remains open (i.e. before delivery or liquidation), NYMEX's Clearing House[1] evaluates the change in value of its customers' open contracts. This process, known as "marking-to-market" the customer's open position, determines whether a customer must post additional margin or, instead, receives payments on margin. The settlement prices are used to value the open positions.

To that end, on a daily basis NYMEX determines the settlement prices for each futures contract. The Commodity Futures Trading Commission ("CFTC"), pursuant to the Commodities Exchange Act ("CEA"), requires NYMEX, as a Designated Contract Market, to record and disseminate these prices. *See* 17 C.F.R. 16.01(b). NYMEX defines a settlement price as "the value, at the end of trading each day, of a particular futures contract for a particular commodity for future delivery at a particular time." For example, today's settlement price for a October 2007 crude oil contract is the fair market value, today, of a contract obliging the purchase or sale of a specified amount of crude oil in October 2007.

---

[1]A clearing house "assumes the credit risk of each party to the transaction by effectively guaranteeing each party's performance obligations," and "becomes the buyer to every seller and the seller to every buyer" through a process known as "clearing" the contract. *New York Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 323 F.Supp.2d 559, 562 (S.D.N.Y. 2004).

The subcommittees of the NYMEX Settlement Price Committee (the "Committee") are charged with determining the settlement price of each open futures contract for each commodity. Unlike on a securities exchange, the settlement price may not be the final trade, for two reasons. First, because of the nature of the trading, it is not always clear which trade was the closing trade. Traders handwrite their transactions on cards which are thrown into the center of trading rings, scooped up, time stamped, and sent for processing. Because the cards may be "scooped up" out of order, the card with the latest time stamp may not represent the final trade of the day. Second, on any given day, 32 or 33 months of crude oil futures contracts and 72 months of natural gas futures contracts are being traded. For the "outer" months, those further from the trading date, there is often little or no trading on a particular day.

After the trading floor closes, the Committee determines the appropriate price for the delivery of crude oil for each of the next 32 or 33 months and for delivery of natural gas for each of the next 72. NYMEX's rules distinguish between months with sufficient trading and open interest[2] and months without (for simplicity, we will call the former "high-volume" months and the latter "low-volume" months). For high-volume months, settlement prices are based on a formula: "a weighted average of all trades done within the closing range." While only a small number of delivery months are high-volume on any given day, ICE claims that these months "represent a large percentage of the total daily trading volume in these contracts."

For low-volume months, the extent of the Committee's creative judgment is disputed. NYMEX asserts that the membership "considers, sifts, weighs and extrapolates from a wealth of

---

[2] Open interest refers to the total number of contracts that have been entered into but have not yet expired and are thus "open" at the clearing house.

data at the close of trading to reach an opinion" as to the appropriate settlement price. ICE contends that there is little judgment involved because the subcommittees only review "objective market data," and, in practice, "look at settlement prices for the near month contracts—*i.e.*, those that are determined by mathematical formula—and then extrapolate to determine the remainder of the settlement prices based on the changes in the month-to-month spread relationships in the various contracts compared to the previous day."

NYMEX's rules also provide that the Committee may override the settlement price for a high- or low-volume month. The frequency of the use of the override provision is disputed.

After determining the settlement prices, NYMEX uses and disseminates them in several ways. First, its Clearing House uses the settlement prices to place current values on the accounts of all NYMEX Clearing Members whose clients have open positions. The members then use the settlement prices to mark-to-market their customers' open positions. Second, it publicly discloses those prices by the next business day, as required by the CFTC. *See* 17 C.F.R. Pt. 38, App. B, Core Principle 8. Third, between the time of creating the prices and the required public disclosure the following day, NYMEX supplies them to market data vendors such as Reuters pursuant to license agreements. These vendors then disclose the prices to their subscribers. Fourth, the prices are disclosed to the public on NYMEX's website.

ICE is one of the subscribers that receives settlement prices through a licensed market data vendor. While ICE cannot clear trades itself, it contracts with the London Clearing House ("LCH") to do so. ICE copies NYMEX's settlement prices and forwards them to LCH which clears ICE's customers' trades. One small exception, however, is when there has been trading on an ICE contract and it is not the final day of trading for that particular contract. In that case, the

5

ICE committee adjusts the NYMEX settlement price one "tick" (one cent for crude oil and one tenth of a cent for natural gas) closer to the weighted average price of the ICE trades. This exception is used more often for natural gas contracts, but even there, most of the prices transmitted to LCH are copied from NYMEX.

In March 2002, NYMEX sought a copyright for its database including the settlement prices. After the Copyright Office informed NYMEX that it was unwilling to provide a copyright in settlement prices, NYMEX filed a replacement application and obtained a copyright for its database only.

NYMEX brought this suit in November 2002, in the Southern District of New York, alleging copyright infringement,[3] trademark infringement under federal and state law, and a state law claim of tortious interference with contract.

ICE moved for summary judgment on all of NYMEX's claims; NYMEX cross-moved for partial summary judgment on the copyrightability of NYMEX's settlement prices and on its state law tortious interference claim. The district court granted ICE summary judgment on both the copyright and trademark claims; it then declined to exercise supplemental jurisdiction and dismissed the state law claims as well. *New York Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 389 F.Supp.2d 527, 530, 547 (S.D.N.Y. 2005).

The district court resolved the copyright question without "determin[ing] the degree of creativity that goes into the setting of individual prices." *Id*. at 541 n.10. Instead, it found two

_____

[3] 17 U.S.C. § 411 provides that where all components of a "registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights."

grounds for depriving NYMEX of copyright protection in its settlement prices. First, it found that these prices are "real-world facts," the "actual price at which a futures contract must be settled," and are "widely publicized and used as benchmarks by market participants." *Id.* at 542. "[B]ecause . . .the only way to express the idea of a settlement price," is a single number, the idea "cannot be distinguished from its expression, [and] the merger doctrine applies." *Id.* at 542-43. Second, the settlement prices are "non-copyrightable words or short phrases." *Id.* at 543. The district court did not address ICE's additional arguments for denying NYMEX's copyright claim. *Id.* at 544 n.13. NYMEX does not appeal the trademark ruling so that portion of the district court's decision is not relevant to this discussion.

NYMEX argues that the district court erred because settlement prices are copyrightable. Furthermore, it argues that the district court abused its discretion in declining to exercise supplemental jurisdiction over the state law claims. ICE defends the district court's decision and argues for several alternate grounds to affirm. The United States has filed an *amicus curiae* brief in support of ICE, arguing that the settlement prices are facts, even if they are not facts the idea of the prices have merged with their expression, and even if merger did not apply, the prices are not copyrightable because they are short phrases.

## II.

We review grants of summary judgment de novo. *See Island Software and Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 260 (2d Cir. 2005)*; Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In doing so, we "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

7

inferences against the movant." *Dallas Aerospace*, 352 F.3d at 780. We review for abuse of discretion a district court's decision to decline to exercise supplemental jurisdiction. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003).

The Constitution provides that "Congress shall have power to . . . promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. Art. I, § 8, cl. 8. Pursuant to this power, Congress enacted the Copyright Act, 17 U.S.C. § 101 *et seq.*; the latest version of the Act states: "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* § 102(a). One of the categories of protectable works listed in the Act is "literary works," *id.* § 102(a)(1), defined as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied," *id.* § 101.

"The *sine qua non* of copyright is originality." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 345 (1991). Originality is a constitutional requisite and requires that the "work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity." *Id.* Originality has been described as "founded in the creative powers of the mind . . . the fruits of intellectual labor," *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) (emphasis omitted), and evidencing "intellectual production, . . . thought, and conception," *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884).

8

In contrast, "facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Feist,* 499 U.S. at 347. "[A]ll facts—scientific, historical biographical, and news of the day . . . may not be copyrighted and are part of the public domain available to every person." *Id.* at 348 (internal quotation marks omitted). As Professor Nimmer explains in his leading copyright treatise:

> The "discoverer" of a scientific fact as to the nature of the physical world, an historical fact, a contemporary news event, or any other "fact," may not claim to be the "author" of that fact. . . .The discoverer merely finds and records. He may not claim that the facts are "original" with him, although there may be originality and hence, authorship in the manner of reporting, *i.e.*, the "expression," of the facts. As copyright may only be conferred upon "authors," it follows that . . . discoveries as facts *per se* may not be the subject of copyright.

1-2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.03[E] (2006) ("Nimmer") (internal footnote call numbers omitted). NYMEX concedes, and indeed it is "universally understood," that if a settlement price is a fact, it cannot be copyrighted. *Feist,* 499 U.S. at 344.

In elucidating the distinction between original creation and discovery, the *Feist* Court provided a helpful example: census takers are not authors of the census data. Census takers merely discover the appropriate population figure; "in a sense, they copy these figures from the world around them." *Id.* at 347.

The question then, is one of characterization: does the Committee create the settlement prices, or is it more accurate to view the Committee's task as like that of a census taker, copying the market's valuation of futures contracts? While the line between creation and discovery is often clear-cut, we recognize that it is a difficult line to draw in this case. For reasons we explain below, we believe there is a strong argument that, like the census taker, NYMEX does not

9

"author" the settlement prices as the term is used in copyright law.[4] *See Burrow-Giles*, 111 U.S. at 57-58 (defining "author" as "he to whom anything owes its origin; originator; maker" (internal citation omitted)). Still, because this is a close question, particularly at the summary judgment stage, we do not decide whether settlement prices are unoriginal, and instead affirm based on the merger doctrine, as discussed in Part III.

In considering how to characterize the Committee's task we start with what a settlement price measures. For high-volume months, settlement prices are determinations of how the market values a particular futures contract. After all, there is no dispute that the Committee members seek to determine the appropriate market valuation of each commodity contract, not how the market *should* value them or *will* value them. Under this view, the market is an empirical reality, an economic fact about the world, that Committee members are seeking to discover. Thus, there is a strong argument that, as a matter of law, the Committee is discovering

---

[4] In disagreeing with this statement in his concurring opinion, we respectfully suggest that Judge Hall misconstrues our analysis. Most crucially, Judge Hall states that we "contemplate heightening the standards by which we determine whether a work exhibits 'some minimal degree of creativity.'" [**Concurrence at 1**] (quoting *Feist*, 499 U.S. at 345). The concurrence confuses independent creation with creativity. Originality requires both that the "work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345; *see also Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 681 (2d Cir. 1998) ("The 'originality' standard requires that the work result from 'independent creation' *and* that the author demonstrate that such creation entails a 'modicum of creativity.'" (emphasis in original)); 1-1 Nimmer § 1.08 [C][1] ("It is important to distinguish between the requirement of originality and the requirement of intellectual labor. . . . The doctrine of originality stems from the Copyright Clause's use of the term 'authors' and refers to independent creation. Intellectual labor, on the other hand, suggests an absolute standard, albeit a highly minimal one, of creativity." (internal footnote call number omitted)). While there is a strong argument that NYMEX did not independently create the settlement prices, we—like the district court—do not consider the extent of NYMEX's creativity. *See New York Mercantile Exch., Inc.*, 389 F.Supp.2d at 541 n.10. Judge Hall also states that our logic is circular. It is not. It originates with the premise that settlement prices are discovered from actual market activity.

facts, not creating predictions or estimates.[5]  So characterized, there is one proper settlement price; other seemingly-accurate prices are mistakes which actually overvalue or undervalue the futures contract.  After all, as NYMEX's Executive Vice President and Chief Operating Officer has stated, NYMEX's settlement prices are heavily relied upon because they "reflect actual trades," not mere sentiment.[6]

That said, characterizing the Committee's task as discovery, even for high-volume

---

[5]  *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994), which held that the Red Book, a compilation of estimated projections for used car prices, merited copyright protection, is not to the contrary.  While *CCC* stated that "[t]he valuations themselves are original creations of Maclean [Red Book's publisher]," 44 F.3d at 67, that statement does not resolve the instant case.  First, this statement is arguably dicta, as a compilation as a whole may be worthy of copyright protection even where the component parts of a compilation may be unoriginal or mere facts. *Feist,* 499 U.S. at 348.  Thus, because *CCC* found that the compilation deserved protection due to "the selection and arrangement of data," *CCC*, 44 F.3d at 67, it was not necessary to also hold that the individual estimates were copyrightable. *See Cotto v. Herbert*, 331 F.3d 217, 250 n.20 (2d Cir. 2003).  Second, *CCC* is distinguishable on its facts.  The used car prices in *CCC* were indeed created, they were the "editors' predictions . . . of expected values for 'average' vehicles for the upcoming six weeks in a broad region." *CCC*, 44 F.3d at 63.  The values were based on assumptions about "average" cars; as these cars did not exist, there could be no actual market to discover.  In contrast, settlement prices can be seen as "pre-existing facts" about the outside world which are discovered from actual market activity.  Additionally, though not itself dispositive, NYMEX's customers and Clearing House treat the settlement prices as indisputable facts, whereas in *CCC* a subscriber could not rely solely on the Red Book in valuing any particular used car. *See id.* at 63-64 ("The introductory text [of the Red Book] asserts, 'You, the subscriber, must be the final judge of the actual value of a particular vehicle. Any guide book is a supplement to and not a substitute for expertise in the complex field of used vehicle valuation.'").  Similarly, *CDN Inc. v. Kapes*, 197 F.3d 1256,1260 (9th Cir. 1999), cited by NYMEX, is distinguishable because the prices for collectible coins in that case were estimates, not discovered market facts.

[6] While NYMEX now argues that settlement prices are merely opinion, we note that NYMEX itself treats the prices as news of the day.  Within minutes of determining the settlement prices it disseminates them to its internal Clearing House.  In turn, the Clearing Members calculate customers' margins based on the settlement prices.  NYMEX also provides the prices to newspapers which publish them alongside other market facts.  All customers with NYMEX accounts are bound by NYMEX's calculation.

months, is disputable. The analogy to the census taker is not perfectly apt because the discovery of a settlement price is a more abstract concept than the discovery of a population figure; an economic reality is certainly less tangible than a population reality. For example, with sufficiently precise tools we could perhaps measure the population of a metropolis, whereas it is not clear that we could ever precisely calculate the appropriate valuation of a particular futures contract.

The characterization inquiry is even more difficult for low-volume months, particularly at the summary judgment stage. We recognize that settlement prices are determined for 32 or 33 months of crude oil futures contracts and 72 months of natural gas futures contracts every day. There is generally less trading in contracts for the outer months. It may be the case that there is a material factual dispute whether, for certain outer months, there is so little trading that there is no real market to speak of. Where there is no market the Committee's work appears closer to creation, to making "predictions . . . of expected values." *CCC*, 44 F.3d at 63. For such months, then, we are particularly reluctant to hold, as a matter of law, that the Committee is discovering the settlement prices.[7] In any event, it is unnecessary to resolve this question and we instead affirm because even if NYMEX creates the settlement prices, NYMEX's claim fails due to application of the merger doctrine, as explained below.

**III.**

Assuming that the settlement prices are created and not discovered, we consider whether

---

[7] This is not to say that summary judgment is necessarily inappropriate in resolving whether the task is one of discovery or creation. Indeed, it will generally be the case that such characterizations can be made as a matter of law.

the merger doctrine should be applied to withhold copyright protection.[8]  "It has been long accepted that copyright protection does not extend to ideas; it protects only the means of expression employed by the author."  *CCC*, 44 F.3d at 68; *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").  Because "ideas are too important to the advancement of knowledge to permit them to be under private ownership," and because "open public debate, which is essential to a free democratic society, requires free access to the ideas to be debated," ideas cannot be copyrighted.  *CCC*, 44 F.3d at 69.  Instead, "only the manner of [an idea's] 'expression'" is copyrightable.  *Id.*

To ensure free access to ideas, courts have applied the merger doctrine such that "even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself."  *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991); *see also* 4-13 Nimmer § 13.03[B][3] (explaining that "courts have invoked the merger doctrine" where "rigorously protecting the expression would confer a monopoly over the idea itself, in

---

[8]  "In this circuit, consideration of the merger doctrine takes place in light of the alleged copying to determine if infringement has occurred, rather than in analyzing the copyrightability of the original work."  *CCC*, 44 F.3d at 72 n.26.  Thus, we can only reach this analysis if we assume that settlement prices merit copyright protection.  Having assumed that the prices are copyrightable, we consider the alleged copying in determining whether to apply the merger doctrine.  *See id.*; *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991).  We think the district court should not have collapsed these two inquiries.  Nonetheless, we can affirm based on the ample record evidence regarding the nature of ICE's copying, making remand unnecessary.  *See Prisco v. A&D Carting Corp.,* 168 F.3d 593, 610 (2d Cir. 1999) (noting that we may "affirm the judgment of the district court on any basis for which there is a record sufficient to permit conclusions of law" (internal quotation marks omitted)).

13

contravention of the statutory command"). We must exercise "considerable care," in analyzing merger: "if the merger doctrine is applied too readily, arguably available alternative forms of expression will be precluded; if applied too sparingly, protection will be accorded to ideas." *Kregos*, 937 F.2d at 705.

We begin by identifying the "idea" that might be merging with its expression. The district court stated that the idea is "the price of a particular futures contract at the close of trading." *NYMEX,* 389 F. Supp. 2d at 541. NYMEX disputes this approach and argues that the idea is "that a sound and reasonable opinion of fair market value for each NYMEX contract as of the close of open outcry trading on the NYMEX floor each day may be achieved by assessing trades, bids, and offers and (in various instances) off exchange information, particularly developed late in the trading day." The United States disagrees, and argues instead that a "settlement price is the expression of a much more specific idea, for example, that a Henry Hub natural gas futures contracts is worth $25 dollars [sic] at the end of a given day."

Even if we accept NYMEX's formulation, however, the expression here merges with the idea. In this Circuit, we look at the range of possible expressions and consider whether all possible expressions are so "substantially similar" that granting the copyright would bar others from expressing the underlying idea.[9] *Hart v. Dan Chase Taxidermy Supply Co., Inc.*, 86 F.3d

_____

[9] While we have stated, in dicta, that "if there is *just one way* to express an idea, the idea and expression are said to merge," *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (emphasis added), *Kregos,* 937 F.2d at 705, made clear that the merger doctrine may be applied "where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." Indeed, we have never foreclosed application of the merger doctrine when there was a limited number of expressions of the idea, albeit greater than one. *Cf. Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99 (2d Cir. 2002) (holding that "the merger argument is inapposite to the context presented here" because "the art of translation involves choices among *many possible*

320, 322 (2d Cir. 1996). To survive summary judgment, then, NYMEX must demonstrate that the range of possible settlement prices is broad enough that any possible expression will not "necessarily be 'substantially similar.'" *Id.*

It cannot meet that burden. NYMEX is not seeking a copyright in the process whereby settlement prices are created.[10] Instead, the "fair market value for each NYMEX contract" is expressed as a settlement price, and it is these prices that NYMEX seeks to bar ICE from using. It is undisputed that all possible expression takes the same form, a number. The question then becomes the possible range of that number. Because any settlement price for a particular futures contract would be determined based on the same underlying market facts, any dissension would be exceptionally narrow. While NYMEX contends that there are "numerous possible variations . . . as to what the Settlement Prices should be," it has not demonstrated a range of possible variations that would preclude application of the merger doctrine. *See Colavito v. New York Organ Donor Network, Inc.*, 486 F.3d 78, 81 (2d Cir. 2007) ("A party may not defeat a Rule 56 motion based on conjecture alone."). Instead, the record merely demonstrates that, at times, Committee members have disagreed on the exact settlement price. To grant NYMEX copyright protection here "would effectively accord protection to the idea itself," *Kregos*, 937 F.2d at 705,

_____

*means* of expressing ideas" (emphasis added)). We need not determine how many expressions would be too many for application of the merger doctrine. The appropriate inquiry focuses not on the exact quantity of possible expressions but on the effect of granting copyright protection; we ask whether "protection of expression would inevitably accord protection to an idea." *Yurman Design,* 262 F.3d at 112.

[10] NYMEX disclaims any protection in the "building block ideas" of a settlement price; ICE is free to use the "abstract idea of making a judgment to reach its own opinion as to the end-of-day values of NYMEX contracts," or even "the concept that a weighted average price be used for the most actively traded month or two or a 10% criteria be used to determine which one or two months will use the weighted average."

and bar ICE or other competitors from valuing NYMEX's contracts. We decline to do so.

Furthermore, policy considerations weigh heavily in determining the appropriate application of the merger doctrine. *See CCC*, 44 F.3d at 72 (noting that "*Kregos*, [937 F.2d 700] . . . makes a policy judgment as between two evils," and withholding application of the merger doctrine where "[u]nbridled application of the merger doctrine would undo the protection the copyright law intends to accord"). "[T]he objectives of the copyright law . . . [are] to promote the advancement of knowledge and learning by giving authors economic incentives (in the form of exclusive rights to their creations) to labor on creative, knowledge-enriching works." *Id.* at 65. Without such incentives authors "might direct their energies elsewhere, depriving the public of their creations and impeding the advance of learning." *Id.* at 66. Put another way, "copyright is intended to increase and not to impede the harvest of knowledge," while also "assur[ing] contributors to the store of knowledge a fair return for their labors." *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 545-46 (1985).

NYMEX needs no such incentives here. In order to establish a functioning commodities market it must have a price at which to settle open positions. Furthermore, NYMEX is required by law to record settlement prices, and it does not challenge the legality of that rule. *See* 17 C.F.R. 16.01(b)(2) ("Each reporting market shall record the following information . . . [t]he settlement price established by each reporting market or its clearing organization."). Even without copyright in its settlement prices we are confident that NYMEX will not "direct [its] energies elsewhere," *CCC*, 44 F.3d at 66, as its exchange requires settlement prices to clear contracts.

We therefore apply the merger doctrine and hold that, in using the settlement prices, ICE

16

"took nothing more than ideas, for which the copyright law affords no protection to the author." *Id.* at 68. Because "the expression is essential to the statement of the idea, the expression [is] also . . . unprotected." *Id.*

As NYMEX cannot prevail due to application of the merger doctrine, we reach neither the district court's analysis of the short phrases doctrine nor ICE's alternative bases on which to affirm.

## IV.

Having determined that the district court correctly found that NYMEX's federal copyright claim fails, we must now consider whether the district court abused its discretion in declining to exercise supplemental jurisdiction over NYMEX's state law claims. We find that the district court acted well within the bounds of its discretion. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998). Furthermore, here the district court determined that resolving the state law claim would entail resolving additional issues of fact, *NYMEX,* 389 F.Supp.2d at 547, making dismissal of those claims after the federal claims had been dismissed particularly appropriate.

## V.

For the foregoing reasons, we hereby **AFFIRM** the judgment of the district court granting summary judgment to the defendants, denying plaintiff's cross-motion for partial summary judgment, and declining to exercise supplemental jurisdiction.

HALL, *Circuit Judge*, concurring in part:

I agree with the result reached in the majority opinion; NYMEX settlement prices do not merit copyright protection. I write separately, however, to register my disagreement with the majority's analysis in Part II of its opinion, where it asserts, unnecessarily in my view, that there exists a "strong argument" NYMEX settlement prices lack the requisite originality to qualify for copyright protection. In so doing, the majority renders dicta that contemplate heightening the standards by which we determine whether a work exhibits "some minimal degree of creativity." *Feist Publ'ns v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). This is a step contraindicated both by our jurisprudence and by the procedural posture of this case. Because the application of the merger doctrine, as explained in Part III of the majority's opinion, makes it unnecessary for us to consider this question of originality, I concur in all but Part II of the majority's opinion.

In this case, NYMEX faced the task of meeting the originality requirement in the context of an appeal from summary judgment. Rooted in the Constitution, the originality requirement of copyright presents an extremely low bar. *Feist*, 499 U.S. at 345-46. To prove possession of a valid copyright, a party must show a subject is an "original work of authorship." 17 U.S.C. § 102(a); Nimmer on Copyright, § 2.03[A] (2004 ed.). The Supreme Court has emphasized that "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345. "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some

18

creative spark, no matter how crude, humble or obvious it might be." *Id.* (internal citations omitted); *see also Key Publ'ns v. Chinatown Today Publ'g. Enters.*, 945 F.2d 509, 512-13 (2d Cir. 1991).

Accordingly, to survive summary judgment on the issue of originality, NYMEX must show, in "view of the facts in a light most favorable" to it, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), there exists some "genuine issue as to any material fact," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), of whether the settlement prices contained an "extremely low . . . slight amount" of "creative spark, no matter how crude, humble or obvious." *Feist*, 499 U.S. at 345. This combined standard is a permissive one indeed, posing a virtually non-existent bar to NYMEX's efforts to demonstrate the originality of its work.

NYMEX has vouched forcefully for the originality of its settlement prices. NYMEX asserts it uses "judgment and discretion" to create them; according to one witness, "[t]he whole thing is about opinions." Indeed, as NYMEX would have it, its Settlement Price Committee is the Shakespeare of the commodities clearing world, crafting its settlement prices like so many numeric sonnets. Naturally, ICE disagrees, and the majority largely credits, albeit in dicta, ICE's assertions. But, given the permissive originality requirement of our jurisprudence as applied on appeal from summary judgment, I cannot so easily accept that ICE has made such a "strong argument" against the originality of NYMEX's settlement prices.

The majority attempts to skirt this issue, implicitly acknowledging there may be an element of creativity in producing settlement prices, but asserting that NYMEX "is discovering facts, not creating predictions or estimates." I respectfully suggest such a rationale is mistaken for at least three reasons.

19

First, in supposing that NYMEX discovers, rather than creates, the settlement prices, the majority contradicts prior precedent of this Circuit. In *CCC Information Services, Inc. v. Maclean Hunter Market Reports*, 44 F.3d 61 (2d Cir. 1994), we held that an individual car price valuation could be creative; the creativity lay in the integration of "a multitude of data sources, but also on professional judgment and expertise." *Id*. at 67. Settlement prices are no different; they arise from the integration of data sources (the prices and circumstances of trades during the day), as well as professional judgment or expertise (the opinion of the Settlement Price Committee). Just as *CCC* found the creativity inhered in the creation of a valuation, not the discovery of a value, so too should we find that any creativity of NYMEX lies in the creation of the settlement price, not in discovery of a price that may or may not exist at any given point in the trading day. *See also CDN Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999) (O'Scannlain, J.).

Second, it would appear the rationale is circular. The majority instructs that although "it is not clear that we could ever precisely calculate the appropriate valu[e]" of a futures contract, settlement prices nevertheless are unoriginal because they are discoverable facts, not creations of NYMEX. But why are the settlement prices facts, not creations? Unless I misread the majority opinion, their answer turns on the conclusion that settlement prices lack the spark of originality. In other words, the settlement prices are facts, and therefore unoriginal; they are unoriginal because they are facts. This is a tautology, to which I cannot subscribe.

Third, there is good reason to doubt one predicate of the tautology, that settlement prices are "facts." A settlement price is an "*arbitrary* price used as the basis for the settlement of contracts through a clearinghouse." *Webster's Third New International Dictionary* 2079 (2002) (emphasis added). It is "the amount . . . *treat[ed] as* the value, at the end of trading each day, of

20

a particular futures contract for a particular commodity for future delivery at a particular time" (Appellant's Brief, 6) (emphasis added). The settlement price does not replicate individual trades; nor does it replicate a weighted average of those trades. To the contrary, NYMEX's settlement price formula includes an override mechanism, such that even if NYMEX did know the precise "fact" of the day's weighted average, it could adjust that average to conform to what it considers, in its judgment or opinion, to be the better "arbitrary price," or "amount . . . treat[ed] as the final value." Thus, given the posture of this case, one could easily conclude that settlement prices are not preexisting facts about the world; they are evaluative opinions *created* by NYMEX. True, they derive *in part* from facts about the world, such as the prices and circumstances of trades during the day (*See* Majority Opinion at 11, fn 4). But this proves nothing; many copyright-worthy creative works derive in part from facts.

As the majority acknowledges, however, this panel need not—and, indeed, does not—reach the question of originality of settlement prices other than in dicta. Instead, the majority grounds its affirmation of the denial of copyright protection to NYMEX's settlement prices exclusively by applying the merger doctrine. Because I find the majority's analysis of the merger doctrine to be persuasive, and because its discussion of originality is unnecessary, I concur in all but Part II of the majority's opinion.